No. 103,559

STATE OF KANSAS, *Appellee*, v. EVELYN L. WELLS, *Appellant*.

(290 P.3d 590)

66

68

Opinion filed December 14, 2012.

*Korey A. Kaul*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Matt J. Maloney*, assistant district attorney, argued the cause, and *Nola Tedesco Foulston*, district attorney, and *Derek Schmidt*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

ROSEN, J.: Evelyn L. Wells and Reginald Stafford were separately charged and jointly tried and convicted of various person and off-grid felony offenses involving Wells' minor child, S.W. As a result, the facts and several issues stemming from this appeal are identical to those appearing in *State v. Stafford*, No. 103,521, this day decided.

A jury found Wells guilty of two counts of rape in violation of K.S.A. 21-3502(a)(2), an off-grid crime, one count of aggravated criminal sodomy in violation of K.S.A. 21-3506(a)(1), an off-grid crime, and one count of aggravated endangering a child in violation of K.S.A. 21-3608a(a)(1), a severity level 9 person felony. On appeal, Wells argues: (1) The prosecutor committed misconduct during his closing argument by misstating the legal meaning of the unanimity instruction given to the jury; (2) the jury was presented with alternative means of finding Wells guilty of aggravated criminal sodomy (oral), one of which was not supported by sufficient evidence; (3) the district court improperly limited cross-examination of the victim, S.W.; (4) the district court, by answering a jury question with a written note, violated Wells' constitutional right to be present at all critical stages of her trial; (5) cumulative error deprived Wells of a fair trial; (6) the district court abused its discretion in denying Wells' motion requesting a departure sentence; and (7) the district erred by setting 25 years' imprisonment as the minimum prison term Wells must serve before becoming parole eligible. Based on the analysis below, we find no merit to any of Wells' arguments. Accordingly, we affirm her convictions and sentences.

## FACTS

Between August 2006 and July 2007, S.W., born April 19, 2001, lived with her mother, Wells; her stepfather, Rex; and her 12-year-old half-brother, Rocky, in a two-bedroom apartment in Wichita. During this same time period, S.W.'s older half-brother, Robert (who graduated from high school during this time) stayed at the apartment periodically, and S.W.'s older half-sister, Jessica, along with her husband, Ruben Diaz, moved into the apartment. Jessica

and Diaz would eventually separate, but Diaz continued living at the apartment after the couple's separation.

Sometime around December 2006, S.W. told Robert—then, with Robert's urging, told Rocky—that a person named "Reggie" had touched her vagina with his finger. Though Robert claimed that at the time he did not know a person named Reggie (a claim unsupported by Rocky's testimony), Rocky recognized the name as referring to Stafford, a person Rocky had known since he was 4 years old. Stafford, who lived nearby, would occasionally visit the apartment, and Wells would also visit Stafford at his home. Rocky said that Wells would sometimes take S.W. with her when she visited Stafford. Rocky estimated that this took place once every 2 to 3 months. Notably, Rocky said that on the day S.W. told him and Robert that Stafford had touched her, Wells had taken S.W. to Stafford's house. Wells had brought S.W. back to the apartment before going out again that evening with Stafford.

Robert and Rocky failed to tell anyone about S.W.'s statement. Regardless, sometime between December 2006 and March 2007, Diaz overheard Robert tell Rocky that he thought Wells had "sold [S.W.] for money," which Diaz interpreted as meaning Wells had prostituted S.W. to someone. Because he did not know whether Robert's statement was true, Diaz tried to observe something that would corroborate what he had heard before telling someone about Robert's statement. But after failing to notice anything to corroborate the statement, Diaz eventually told his boss, Robert Barnes, on Sunday, July 8, 2007, about overhearing the statement.

The next day, July 9, Barnes contacted authorities, resulting in Melissa Gardner, a social worker with the Kansas Department of Social and Rehabilitation (SRS), and William Riddle, a detective with the Wichita Police Department, going to the apartment that day to investigate the allegation. But neither Wells nor S.W. were at home that day. The next day, July 10, patrol officers went to the apartment and made contact with S.W. The officers placed S.W. in protective custody and transported her to the Wichita Children's Home where she was interviewed by Gardner and Riddle. Rocky was also removed from the apartment that same day.

During her interview with Gardner and Riddle, S.W., who appeared to be happy and comfortable with being interviewed, did not disclose to them that she was being sexually abused. Gardner also spoke to Rocky and Robert on July 10. Rocky denied that S.W. had ever been inappropriately touched, and Robert told Gardner that he did not have any concerns about something bad happening to S.W. Robert failed to mention S.W.'s statement about a person named Reggie touching her vagina.

After S.W.'s interview was completed on July 10, she was placed in foster care with Joyce White-Dechant. Kerri Myers, an employee of Youthville, became S.W.'s case manager. According to White-Dechant, she was not aware of S.W.'s background or the allegation that she had been sexually abused when S.W. came to live with her. White-Dechant said that when S.W. first came to stay with her, S.W. was "very quiet, very distraught, angry, sleepless, wet the bed, didn't eat well, [and] had a stomach ache all the time." White-Dechant also said that S.W. had told her that she did not want to go home and was scared to do so. During the time S.W. lived with White-Dechant, S.W. attended counseling about twice a week.

In October 2007, White-Dechant came into the bathroom while S.W. was taking a bath and noticed S.W. fondling herself. White-Dechant asked S.W. if anybody had ever "bothered her." In response, S.W. ducked her head and did not answer. White-Dechant told S.W. that it was okay and that if she ever had anything she wanted to tell, White-Dechant would listen to her. White-Dechant then left S.W. in the bathroom and went to her own bedroom. A short time later, S.W. came into White-Dechant's bedroom and told her that there was something she needed to tell her. According to White-Dechant, S.W. said that she had been touched before. White-Dechant then asked S.W. if she had been touched more than once. S.W. said yes and stated that she had been touched on her "potty." White-Dechant asked if potty meant her private part, and S.W. said yes.

Initially, S.W. would not tell White-Dechant who had touched her, but she eventually identified the person as Wells' boyfriend, Reggie. According to White-Dechant, S.W. told her that Wells was

trying to get money from Reggie in exchange for having sex with S.W. S.W. also told White-Dechant that Reggie lived "down and around the corner" from her apartment.

After S.W. made her disclosure, White-Dechant immediately contacted Myers, and Myers came to White-Dechant's home the next day to speak with S.W. On that day, Myers said that S.W. acted more anxious than usual and seemed distracted. After Myers had been there for a while, she asked S.W. if she had something that she wanted to talk about, and S.W. said that she did. At that point, White-Dechant left the room, leaving Myers and S.W. together by themselves. S.W. then told Myers that a man named Reggie had touched her. Using a female doll that White-Dechant had inside her house, Myers had S.W. show her on the doll where she had been touched. S.W. took the doll, laid it down on her lap with its legs facing her, lifted up the doll's skirt, and repeatedly poked the doll between its legs. Myers described the poking as "forceful and violent."

S.W. told Myers that Reggie lived down the street and that after he would touch her, Wells would take money from him. S.W. also said that Reggie and Wells would go into another room and that when they came out, Reggie would give Wells money. Myers asked S.W. what Reggie and Wells were doing in the other room, and S.W. spelled "s-e-x." Myers asked S.W. if anyone else had touched her, and S.W. said no, that Reggie was the only one.

On October 25, 2007, Myers reported S.W.'s disclosure to SRS. Gardner and Riddle tried to interview S.W. on November 8, 2007, but S.W. had the flu at that time. Accordingly, Gardner rescheduled the interview for November 20. Prior to that time, however, S.W. underwent a sexual assault examination on November 9, which did not reveal any physical injuries or show that S.W. had been infected with any sexually transmitted diseases. Kathy Gill-Hopple, the nurse who conducted the exam, asked S.W. if anyone had ever touched her in a way that made her feel mad or sad, and S.W. responded by saying Reggie touched her. S.W. pointed to her vaginal area and said that Reggie had touched her down there underneath her clothes. When Gill-Hopple asked S.W. what part of Reggie's body touched her, S.W. pointed to her vaginal area and

said that Reggie touched her with his "same spot." Gill-Hopple asked S.W. if Reggie had ever made her touch him, and she said no. But shortly thereafter, S.W. said that Wells had made her touch Reggie. When asked to explain more, S.W. said that Wells made her touch Reggie under his clothes and pointed to her vaginal area again to indicate the area of Reggie's body she was forced to touch. Gill-Hopple also asked S.W. if there were any other parts of her body that Reggie had touched. S.W. answered by pointing behind to her anal area and saying that Reggie had touched her butt with his "same spot" under her clothes.

On November 20, 2007, Gardner and Riddle interviewed S.W. Gardner summarized the interview as follows:

> "She reported that her mother took her to a man named Reggie's house. That they had walked there. That it was nearby her house. That her mother and Reggie had touched her on her—what she called potty, which she indicated on the drawing that was her vaginal area. She said that they touched her potty with their hands on the inside. She said they touched her bottom on the inside as well with their hands. And she said Reggie touched her potty with his lower part, which she indicated was his penis.
>
> "And she also reported that—I asked her if he asked—if Reggie asked her to touch him? She said that he asked her to put her mouth on his lower part. And she said she was scared, but her mom told her to do it and pulled her over to him. She said it was just like an ice cream cone and that white stuff came out. And that she was scared and crying and was screaming. And she said this happened multiple times. She gave a number of five times when we initially asked.
>
> "She also reported it happened on—that her potty—that her mom touched her potty seven times."

Riddle said that during this interview, S.W. stated that these acts occurred when she was in kindergarten during the 2006-2007 school year. According to Riddle, S.W. said the touching occurred after the school year had started but before Halloween.

After interviewing S.W. on November 20, Riddle asked Rocky if he knew a person named Reggie. Rocky said yes and gave Riddle descriptions of Reggie's house and vehicle. Based on Rocky's descriptions, Riddle determined that the name Reggie likely referred to Stafford, who lived only a few blocks away—within walking distance—from the Wells' residence. After obtaining Stafford's driver's license photo, Riddle placed the picture in a photo lineup

with five other photos and showed the lineup to Rocky. Rocky identified Stafford's photo as depicting Reggie.

On November 27, Gardner and Riddle conducted another interview of S.W. During the interview, Riddle showed S.W. the photo lineup and asked her if Reggie's picture was in the lineup. S.W. identified Stafford's photo as depicting Reggie. S.W. told Gardner and Riddle that Stafford had given Wells a "nasty movie" involving animals and people. S.W. said the people did "nasty things" to each other in the movie. S.W. told them she watched the movie at her house and at Stafford's house. Riddle also spoke with Rocky on November 27 and asked him if he was aware of anything that would be bothering S.W. Rocky said he was not aware of anything. But in January 2008, after the State filed charges against Stafford and Wells, Rocky disclosed to law enforcement what Robert had told him about S.W.'s statement.

The State ultimately charged Wells and Stafford with two counts of rape in violation as K.S.A. 2006 Supp. 21-3502(a)(2) and two counts of aggravated criminal sodomy in violation of K.S.A. 2006 Supp. 21-3506(a)(1) (one charge alleging anal sodomy, the other alleging oral sodomy). The State also charged Wells with aggravated endangering a child in violation of K.S.A. 21-3608a(a)(1). The State alleged that all of these crimes occurred sometime between August 15, 2006, and July 10, 2007. Wells and Stafford, despite making requests to have separate trials, were represented by different attorneys at a joint jury trial.

At the trial, Rocky testified that he failed to disclose what S.W. had told him and Robert (that Stafford had touched her vagina) because he was afraid S.W. and he would be taken away from Wells. Robert testified that he did not contact the police or SRS because he was shocked by S.W.'s statement, causing him not to know what to do or how to react. Though Robert did not report S.W.'s statement to the authorities, he did claim that he went over to the apartment more often to keep an eye on S.W. and see if he could notice anything to corroborate S.W.'s story, which, according to Robert, he never did. Robert also said that S.W. never told him that Wells was making her touch or submit to touching by Stafford.

S.W., who was 7 years old at the time of trial, testified that during the time she was in kindergarten, Wells took her to Stafford's home on multiple occasions. S.W. said that Stafford would touch her private every time that she was at his house, which she said occurred eight times. S.W. said Stafford would touch her while they were both naked in his bedroom and lying on a bed. According to S.W., while Stafford was touching her, Wells would be sitting naked on the same bed. S.W. said that Stafford's private touched the inside of her private and that Stafford also put his private inside her mouth. Notably, when S.W. was asked whether anyone had ever touched her "bottom" in a way that she did not like, S.W. said no.

S.W. said that after Stafford was finished touching her, he would give Wells money. S.W. admitted that though she did not actually see Stafford give Wells money, Wells told her about receiving money from Stafford. S.W. said that Wells would spend this money on "whiskey and cigarettes."

S.W. said that on the day she told Rocky and Robert about Stafford touching her, Wells had taken her to Stafford's home earlier that day. S.W. also said that she told White-Dechant about being touched by Stafford.

Wells and Stafford did not testify at trial, nor did they present any evidence. The district court instructed the jury that it could find Wells guilty of the crimes charged against her based on her being a direct participant in the crimes or as an aider and abettor of the crimes. The jury acquitted Wells and Stafford of the aggravated criminal sodomy count alleging anal sodomy. But the jury found Wells and Stafford guilty of both rape counts and guilty of the aggravated criminal sodomy count alleging oral sodomy. The jury also found Wells guilty of aggravated endangering a child.

After denying Wells' motion for a departure sentence, the district court ordered Wells to serve a hard 25 life sentence for each of her two rape convictions and her one conviction for aggravated criminal sodomy. The court ordered the life sentences to run concurrent with one another. The court also imposed a concurrent 7-month prison sentence for Wells' aggravated endangering a child conviction. Wells filed a timely appeal.

More facts will be stated as they become pertinent to the issues discussed below.

## PROSECUTORIAL MISCONDUCT

Wells first contends that the prosecutor committed misconduct during his closing argument when discussing how the jury's unanimity instruction applied to the two rape counts. Wells alleges that these comments were erroneous statements of law that prejudiced her. Accordingly, she asks that we reverse her rape convictions and remand for a new trial.

We apply the following standard to review allegations of prosecutorial misconduct:

"Appellate review of an allegation of prosecutorial misconduct requires a two-step analysis. First, an appellate court decides whether the comments were outside the wide latitude that a prosecutor is allowed in discussing the evidence. Second, if misconduct is found, an appellate court must determine whether the improper comments prejudiced the jury against the defendant and denied the defendant a fair trial. [Citations omitted.]" *State v. Marshall*, 294 Kan. 850, 856, 281 P.3d 1112 (2012).

### *Applicable Facts*

The State charged Wells with two counts of rape, two counts of aggravated sodomy, and one count of aggravated endangering a child, all of which the State alleged occurred sometime between August 15, 2006, and July 10, 2007. S.W.'s prior statements to investigators and her trial testimony established that Wells had deliberately taken S.W. to Stafford's house on multiple occasions (more than two times) during the 2006-2007 school year so Stafford could rape and sodomize S.W. in exchange for money. Though S.W. could not give dates at trial as to when these events occurred, Riddle stated that S.W. indicated at a November 20 interview that Stafford had touched her after she had started kindergarten but before Halloween. Furthermore, S.W. testified that on the same day she made her disclosure to Robert and Rocky that Stafford was touching her, Wells had taken her to Stafford's home earlier that day, where he had again molested her. Consistent with this testimony, Rocky stated that Wells had taken S.W. to Stafford's home

on the same day that S.W. made her disclosure to them, which Rocky believed occurred sometime around December 2006.

Because the evidence presented at trial showed that Wells may have performed multiple, criminal acts, any of which could constitute the charged crimes, the district court gave a unanimity instruction to the jury in order to alleviate the possibility that the jury would convict Wells of the charged crimes without unanimously agreeing on the particular acts that constituted each crime. See *State v. Voyles*, 284 Kan. 239, 244-45, 248-49, 160 P.3d 794 (2007). The instruction stated:

"The State claims distinct multiple acts which each could separately constitute the crime of rape, aggravated criminal sodomy and aggravated endangering a child. In order for the defendant to be found guilty of rape and aggravated criminal sodomy and aggravated endangering a child, you must unanimously agree upon the same underlying act."

During closing arguments, the prosecutor made the following comment regarding the unanimity instruction's application to the rape counts:

"Instruction number 17, it's kind of referred to as the multiple acts instruction. What it says is, in essence, *and you read it if I'm misquoting here*, but it says, in essence, you all have to agree that these things are unanimous that these things occurred on specific times. I don't have a date to give you. [S.W.] doesn't have a date to give you. *But you must unanimously agree that it happened at least once as to this count. And then later on there's a separate rape count. You have to agree that it happened at least a second time.*" (Emphasis added.)

The prosecutor used similar language when discussing the second count of rape, saying:

"Instruction number eight has to do with, again, rape. I'm not going to repeat this. *You simply have to find unanimously that it happened at least a second time.* She's very clear it happened many times. Was it truly eight? Was it five or six? She's not sure. But she knows it happened a lot, I think were the words she used, a lot or a bunch. Again, child's words. *But you have to unanimously agree that it happened at least that second time.*" (Emphasis added.)

Later during his closing argument, the prosecutor stated, "If I've said anything, as I'm explaining this to you, that you don't think is supported by the instructions, clearly look at the instructions."

In response to the prosecutor's comments about the unanimity instruction, Wells' defense counsel made the following statement during his closing argument:

"And I think it's instruction 17 that [the prosecutor] talked to you about, you've got to agree that it occurred and it's the same incident. Not that she was raped twice during that time period. When. Where. How."

*Analysis*

The purpose of a unanimity instruction is to alleviate the possibility that a defendant will be convicted of a crime without the jury unanimously agreeing on the particular act that constituted the crime. This possibility arises when, as here, a defendant is charged with a crime but the evidence presented at trial shows that the defendant committed multiple criminal acts, any of which could constitute the charged crime. In such a situation, a district court, as was done here, should instruct the jury that it has to unanimously agree upon the particular act constituting the crime. See *Voyles*, 284 Kan. at 244-45, 248-49.

Though the prosecutor, consistent with *Voyles*, told the jury that the unanimity instruction meant that it had to agree the alleged acts "occurred on specific times," he went on to tell the jury that it could find Wells guilty of the first rape count if it unanimously found that S.W. was raped "at least once" and could find Wells guilty of the second rape count if it found that S.W. was raped "at least a second time." The prosecutor's statements misconstrued the meaning of the unanimity instruction because the statements conveyed to the jury that it could find Wells guilty of both rape counts without unanimously agreeing on the underlying act constituting each rape count. Accordingly, we find that the prosecutor's statements misstated the law and, thus, fell outside the wide latitude that a prosecutor is allowed during closing argument. See *State v. Bunyard*, 281 Kan. 392, 406, 133 P.3d 14 (2006) ("Misstating the law is not within the wide latitude given to prosecutors in closing arguments.").

Because we have found that the prosecutor committed misconduct during his closing argument, we move on to the second prong of the prosecutorial misconduct analysis:

"When a prosecutor makes an improper comment during closing argument, an appellate court conducts a harmlessness inquiry, determining whether the misconduct was so prejudicial that it denied the defendant a fair trial. Three factors are considered. First, was the misconduct gross and flagrant? Second, was the misconduct motivated by ill will? Third, was the evidence of such a direct and overwhelming nature that the misconduct would likely have had little weight in a juror's mind? None of these three factors is individually controlling." *Marshall,* 294 Kan. 850, Syl. ¶ 3.

With regard to the first factor—whether the misconduct was gross and flagrant—we consider whether the misconduct was repeated, was emphasized, violated a long-standing rule, violated a clear and unequivocal rule, or violated a rule designed to protect a constitutional right. *Marshall,* 294 Kan. 850, Syl. ¶ 6. Here, the prosecutor repeated his erroneous statements twice to the jury concerning the unanimity instruction's application to the rape counts. Second, to ensure jury unanimity in multiple acts cases, we have clearly and unequivocally required since at least 2001 that the State inform the jury of which acts to rely on in its deliberations or the court must instruct the jury to agree on the specific criminal acts. See *Voyles,* 284 Kan. at 255. This requirement, however, is not based on a constitutional right but on K.S.A. 22-3421's requirement that a jury's verdict in a criminal case be unanimous. See *Voyles,* 284 Kan. at 250 ("[T]he right to a unanimous jury verdict in a Kansas court is not a federal constitutional right or a state constitutional right, but rather a statutory one."). Even if the prosecutor's misstatements were merely inarticulate and not intentional, a prosecutor should be sensitive to our repeated statements regarding the purpose of a unanimity instruction in a multiple acts case. Accordingly, we find that the prosecutor's statements were gross and flagrant.

In analyzing whether a prosecutor's misconduct was motivated by ill will, we consider whether the misconduct was deliberate, repeated, or in apparent indifference to a court's ruling. *Marshall,* 294 Kan. 850, Syl. ¶ 7. At two different times during his closing argument, prosecutor expressed an erroneous understanding of how the unanimity instruction should be applied to the rape counts. But it does not appear to us that the prosecutor deliberately

made the statements regarding the unanimity instruction in order to undermine its application. In fact, before he made the statements at issue, the prosecutor referred the jury to the unanimity instruction and told the jury to read it if he was "misquoting" it and later told the jury that if he had said anything during his closing argument that was not "supported by the instructions, clearly look at the instructions." Furthermore, the prosecutor never made the statements in apparent indifference to the district court's ruling. Accordingly, we conclude that the statements were not the result of ill will on the part of the prosecutor.

Finally, we turn to the third factor: Was the evidence of such a direct and overwhelming nature that the misconduct would likely have had little weight in the minds of jurors? In answering this question, the State, as the party "benefitting from the prosecutorial misconduct, bears the burden to establish beyond a reasonable doubt that the error did not affect the defendant's substantial rights, *i.e.*, there is no reasonable possibility the error affected the verdict." *State v. Inkelaar*, 293 Kan. 414, 431, 264 P.3d 81 (2011); see, *e.g.*, *State v. Raskie*, 293 Kan. 906, 918, 269 P.3d 1268 (2012) (finding prosecutor's misstatement did not affect the outcome of the trial in light of the entire record).

The State contends that the prosecutor's comments had little effect on the result of the trial given the fact that S.W. disclosed to multiple people that she was sexually abused and described the abuse in a manner that was generally consistent (*i.e.*, Wells took S.W. to Stafford's house numerous times during the 2006-2007 school year, where Stafford raped and orally sodomized her). Though S.W. could not give exact dates at trial as to when the acts occurred, Riddle stated that S.W. indicated at a November 20th interview that Stafford had touched her after she had started kindergarten but before Halloween. Furthermore, S.W. testified that on the same day she made her disclosure to Robert and Rocky that Stafford was sexually abusing her, Wells had taken her to Stafford's house earlier that day, where he had again molested her. Consistent with this testimony, Rocky stated at trial that on the same day S.W. made her disclosure to him and Robert about Stafford touching her, Wells had taken S.W. to Stafford's home earlier that day

and had brought her back to the apartment before going out that evening with Stafford. Rocky believed this occurred sometime around December 2006.

Thus, the evidence presented at trial established that Stafford, with Wells' assistance, raped S.W. multiple times throughout the 2006-2007 school year and that one of these instances occurred prior to Halloween 2006 and a second instance occurred around Christmas 2006. Accordingly, we conclude that prosecutor's statements regarding the unanimity instruction would likely have had little weight in the minds of the jurors in determining whether Wells was guilty of both rape counts. We also note that the district court properly instructed the jury on the unanimity requirement and that Stafford's counsel gave a correct explanation of the unanimity instruction during his closing argument. Finally, we note that the jury acquitted Wells of the aggravated criminal sodomy charge alleging anal sodomy. The jury's verdict for this count was likely based on S.W.'s testimony at trial denying that anyone had ever touched her "bottom" in a way that she did not like. Accordingly, we believe the jury's verdict shows that the jury carefully considered which charges were established by the evidence presented at trial.

We conclude that the prosecutor's comments did not improperly prejudice the jury against Wells as to deny her a fair trial.

## ALTERNATIVE MEANS

Next, Wells argues that the district court's instruction on aggravated criminal sodomy (oral) established alternative means for committing the crime. In support of this contention, Wells points to the district court's instruction on sodomy, defining the act in part as "oral contact or oral penetration of the female genitalia *or* oral contact of the male genitalia." (Emphasis added.) Wells contends that this definition instructed the jury that it could find her guilty of aggravated criminal sodomy (oral) under two alternative means—oral contact or oral penetration of the female genitalia *or* oral contact of the male genitalia. Wells concedes that there was evidence of oral contact of the male genitalia (*i.e.*, Stafford placed his penis inside S.W.'s mouth), but she argues that because there

was no evidence presented at trial that S.W.'s vagina was ever orally contacted or orally penetrated, her conviction for aggravated criminal sodomy (oral) must be reversed pursuant to the super-sufficiency requirement of *State v. Wright*, 290 Kan. 194, 224 P.3d 1159 (2010), and *State v. Timley*, 255 Kan. 286, 875 P.2d 242 (1994).

As we recently noted in *State v. Brown*, 295 Kan. 181, Syl. ¶¶ 3-6, 284 P.3d 977 (2012), we begin our analysis of an alternative means issue by looking at the language used in the applicable statute (or in this case, statutes) to determine whether the legislature intended to establish alternative means through the use of the language at issue. Issues of statutory interpretation and construction, including issues of whether a statute creates alternative means, raise questions of law reviewable de novo on appeal. See *State v. Burnett*, 293 Kan. 840, 847, 270 P.3d 1115 (2012); see also *State v. Kesselring*, 279 Kan. 671, 678, 112 P.3d 175 (2005) (court exercises de novo review over jury unanimity issues). The most fundamental rule of statutory construction is that the intent of the legislature governs if that intent can be ascertained. *State v. Arnett*, 290 Kan. 41, 47, 223 P.3d 780 (2010). An appellate court's first attempt to ascertain legislative intent is through an analysis of the language employed, giving ordinary words their ordinary meaning. *State v. Urban*, 291 Kan. 214, 216, 239 P.3d 837 (2010). If a statute is plain and unambiguous, an appellate court does not need to speculate further about legislative intent and, likewise, the court need not resort to canons of statutory construction or legislative history. *Urban*, 291 Kan. at 216.

*Analysis*

In *Brown*, we provided the following guidelines for determining whether the legislature intended for language of a statute to establish alternative means of committing a crime or whether the language merely describes a single means of committing the crime:

"[I]n determining if the legislature intended to state alternative means of committing a crime, a court must analyze whether the legislature listed two or more alternative distinct, material elements of a crime—that is, separate or distinct *mens rea*, *actus reus*, and, in some statutes, causation elements. Or, did the legislature

list options within a means, that is, options that merely describe a material element or describe a factual circumstance that would prove the element? The listing of alternative distinct, material elements, when incorporated into an elements instruction, creates an alternative means issue demanding super-sufficiency of the evidence. Often this intent can be discerned from the structure of the statute. On the other hand, the legislature generally does not intend to create alternative means when it merely describes a material element or a factual circumstance that would prove the crime. Such descriptions are secondary matters—options within a means—that do not, even if included in a jury instruction, raise a sufficiency issue that requires a court to examine whether the option is supported by evidence." *Brown*, 295 Kan. at 199-200.

We also noted in *Brown* that words or phrases stated in a series and separated by the disjunctive "or" do not establish alternative means of committing a crime if they fail to state additional and distinct ways of committing the subject crime, that is, if they do not require proof of at least one distinct, material element of *mens rea, actus reus,* or causation. See *Brown*, 295 Kan. 181, Syl. ¶ 7.

At the time of the offense, K.S.A. 21-3506(a)(1) defined aggravated criminal sodomy as "[s]odomy with a child who is under 14 years of age." The language at issue in this case comes from K.S.A. 21-3501(2), which defines the act of sodomy as *"oral contact or oral penetration of the female genitalia or oral contact of the male genitalia;* anal penetration, however slight, of a male or female by any body part or object; or oral or anal copulation or sexual intercourse between a person and an animal." (Emphasis added.)

K.S.A. 21-3506(a)(1) proscribes the aggravated crime of engaging in the act of sodomy with a child who is under 14 years of age. The language and punctuation of K.S.A. 21-3501(2) indicate that there are three general but distinct ways in which one can complete the act of sodomy: (1) oral contact of genitalia, (2) anal penetration, and (3) sexual intercourse with an animal. See *State v. Burns*, 295 Kan. 951, Syl. ¶ 7, 287 P.3d 261 (2012). We note that each act described within the definition of sodomy is separate and distinct from the other—the acts are factually different from one another, and one act is not inclusive of the others. Furthermore, each act is separated by a semicolon, which suggests that the legislature intended for each act to constitute a specific means of completing the general act of sodomy.

Wells contends that the language used to describe the first means of completing the act of sodomy—oral contact of genitalia—contains separate means within itself (*i.e.*, oral contact or oral penetration of the female genitalia is one means and oral contact of the male genitalia is the other means). We reject this argument because the phrase "oral contact or oral penetration of the female genitalia or oral contact of the male genitalia" does not state material elements of sodomy but merely gives a full description of one means of committing sodomy—oral contact of genitalia. The distinction between female and male genitalia contained within the phrase is superficial and unnecessary. Orally contacting genitalia encompasses both oral contact and oral penetration of the female genitalia as well as oral contact of the male genitalia. See *State v. Britt*, 295 Kan. 1018, Syl. ¶ 5, 287 P.3d 905 (2012) (reaching same conclusion).

The phrase "oral contact or oral penetration of the female genitalia or oral contact of the male genitalia" does not establish two alternative means of committing sodomy. Instead, the phrase only establishes one means of committing sodomy—oral contact of genitalia. Consequently, though the phrase was used in the jury instructions to define sodomy, the phrase does not trigger concerns of jury unanimity or demand application of the super-sufficiency requirement. Consequently, Wells is not entitled to reversal of her conviction for aggravated criminal sodomy.

Because we conclude that the jury in this case was not instructed on alternative means of committing aggravated criminal sodomy (oral), we decline to address the State's argument that *Wright* (rejecting application of a harmless error analysis in alternative means cases) was wrongly decided.

## LIMITATION OF CROSS-EXAMINATION

Next, Wells argues that the district court erred when it prevented defense counsel from questioning S.W. about how deeply Stafford's penis penetrated her. Wells argues that such questioning was crucial to her defense because if S.W. had testified that Stafford repeatedly penetrated her with his whole penis, the jury would have found her allegations of sexual abuse less credible given the

fact that she was examined and found not to have any injuries to her vagina.

A district court may exercise reasonable control over the scope of cross-examination. A district court's decision to limit cross-examination is reviewed under an abuse of discretion standard. *State v. Parks*, 294 Kan. 785, 797, 280 P.3d 766 (2012).

"Judicial discretion is abused if judicial action (1) is arbitrary, fanciful, or unreasonable, in other words, if no reasonable person would have taken the view adopted by the trial court; (2) is based on an error of law, in other words, if the discretion is guided by an erroneous legal conclusion; or (3) is based on an error of fact, in other words, if substantial competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based. [Citation omitted.]" *State v. Warrior*, 294 Kan. 484, 505, 277 P.3d 1111 (2012).

### *Applicable Facts*

During Wells' cross-examination of S.W., the following exchange took place:

"[Defense Counsel]: I'm not a girl, so I have to ask this question because I don't know. I don't have a girl's body. How—when you said Reggie's private went inside your private, how far inside you is that?

"[Prosecutor]: I'm going to object as to relevance.

"The Court: Well, the law does not require anything but any penetration. So limit your cross-examination to that.

"[Defense Counsel]: This goes to physical injuries, your Honor.

"The Court: Well, we don't have—you can limit your examination to what I've told you.

"[Defense Counsel]: All right.

"Q. (By [Defense Counsel]) [S.W.], I'm not going to ask that question of you. Okay.

"A. Okay.

"Q. I'm sorry. How did you know that Reggie's private was going inside you?

"A. I felt it.

"Q. Okay. Because, see, I'm not a girl, and I don't know these things. Right? I'm not as smart as you in that way. Did it hurt?

"A. Yeah.

"Q. Did it hurt a lot?

"A. Yes.

"Q. Okay. You know, have you ever cut your hands or something and seen your own blood? Have you ever cut yourself and had a Band-Aid put on?

"A. Um-hum.

"Q. Have you seen your own blood before?
"A. Um-hum.
"Q. Did you see—when Reggie was doing stuff to you, did you see any of your own blood then?
"A. No."

After S.W. testified, Gill-Hopple, the director of the Sexual Assault Nurse Examiner Program at Via Christi Medical Center and the nurse who conducted the sexual assault examination of S.W., testified at length about the signs of physical trauma that likely would be visible following sexual intercourse between an adult male and a young female. Gill-Hopple testified that she examined S.W. on November 9, 2007, 4 months after S.W. was removed from Wells' apartment and that she exhibited no signs of acute or healed injuries to her genitalia.

Gill-Hopple testified that there is no medical truth to the perception that penetration of the female sex organ necessarily affects the hymen, *i.e.*, one cannot look at the hymen to determine whether a female is a virgin. She further explained that even if a vagina suffers a tear from being penetrated, there is no guarantee that evidence of the tear will remain after it heals. Accordingly, the time between the last sexual encounter and the sexual assault examination plays a great role in determining whether injuries from the assault will be visible to an examiner. Notably, Gill-Hopple testified that it is "very normal" not to find visible injuries to the vagina 3 to 4 months after a sexual assault and that very rarely do pediatric patients show signs of injury—even when it is confirmed that they have been sexually penetrated and are examined within 72 hours after the encounter.

During cross-examination, Wells' attorney had the following exchange with Gill-Hopple:

"Q. And scarring—when we talk about the word scarring, that is evidence that there was a tear and now it's healed up but there's still some evidence that there had been a tear previously?
"A. That is the typical definition of a scar. Um-hum.
"Q. And based upon your expert opinion, or if you want to use common sense as well, multiple insertions of a male penis into a five-year-old vaginal opening is going to increase the likelihood of you being able to find tears or scarring?
"A. No, not necessarily.

"Q. So does it matter the depth of the insertion that would increase the like-lihood?

"A. That's possible."

Neither Wells nor Stafford presented any evidence to contradict Gill-Hopple's testimony or to suggest that the depth of penetration determined whether a child's vagina would suffer lasting physical trauma.

*Analysis*

The question before us is: If S.W. had testified on cross-examination that Stafford's penis penetrated her deeply, could that testimony be considered relevant in determining whether S.W.'s allegation of rape was credible, given the fact that S.W. exhibited no signs of acute or healed injuries to her genitalia? K.S.A. 60-401(b) defines relevant evidence as evidence that is probative and material. In analyzing whether the evidence is material, the focus is on whether the fact at issue has a legitimate and effective bearing on the decision of the case and is in dispute. Evidence is probative if it has any tendency to prove any material fact. *State v. Gilliland*, 294 Kan. 519, 540, 276 P.3d 165 (2012).

S.W.'s credibility was a material issue at trial because it certainly had a legitimate and effective bearing on the jury's determination of whether Wells and Stafford had committed the criminal acts against her. And because Wells and Stafford denied that S.W. was ever sexually abused, S.W.'s credibility was certainly in dispute at trial. But the evidence presented at trial indicates that any testimony S.W. could have given regarding how deeply she was penetrated would have provided little probative value to establishing her lack of credibility.

First, it is unclear what meaningful answer S.W. could have given to the question of how deeply Stafford penetrated her. We question whether a 7-year-old child would have a baseline for measuring the difference between a "deep" and a "shallow" penetration. Regardless, Wells' attorney was able to ask S.W. whether the penetration hurt and whether she bled as a result. S.W.'s answers to these questions—that the penetration did hurt but did not cause her bleeding—would indicate that there was penetration enough

to cause S.W. pain but not necessarily physical injury. This testimony would be consistent with Gill-Hopple's testimony at trial stating that pediatric patients rarely show signs of injury after being sexually penetrated. Gill-Hopple noted that this was true even in cases where it is confirmed that the child has been penetrated and is examined within 72 hours after the sexual encounter. Furthermore, Gill-Hopple stated that even if there is a vaginal tear as a result of a sexual encounter, there is no guarantee that evidence of the injury will remain after it heals. Further, she testified that it is normal not to find visible injuries to the vagina 3 to 4 months after a sexual assault. As noted above, Gill-Hopple did not examine S.W. until 4 months after she was removed from Wells' home.

Based on Gill-Hopple's testimony, the fact that S.W. exhibited no signs of acute or healed injuries to her genitalia would not have contradicted her claim that Stafford had penetrated her. Accordingly, even if S.W. had testified that Stafford penetrated her deeply, such testimony would have done little to discredit S.W.'s allegation of being raped. Accordingly, we conclude that the district court did not abuse its discretion when it prevented Wells' attorney from questioning S.W. about how deeply Stafford had penetrated her.

## THE DISTRICT COURT'S ANSWER TO A JURY QUESTION

Wells next claims that the district court violated her constitutional and statutory rights to be present at all critical stages of her trial when the court—after consulting with the attorneys in the presence of Wells—answered a question from the jury via written note. Wells contends that instead of employing this method, the district court should have answered the jury's question in open court while she was present.

A claim that a defendant was deprived of his or her statutory and constitutional right to be present during a portion of the trial raises legal questions that are subject to unlimited review on appeal. *State v. Engelhardt*, 280 Kan. 113, 121, 119 P.3d 1148 (2005).

### Applicable Facts

During jury deliberations, the jury sent out the following question: "May we please have the legal definition of abets." The district

court consulted with the attorneys in the presence of Wells. Defense counsel objected to any definition being provided to the jury, claiming that the proper response was that words are given their common usage and meanings. Over this objection, the court sent the jury the following written answer: "Abet means to encourage or assist someone."

*Analysis*

A criminal defendant has a constitutional and statutory right to be present at all critical stages of his or her trial. See *Illinois v. Allen*, 397 U.S. 337, 90 S. Ct. 1057, 25 L. Ed. 2d 353, *reh. denied* 398 U.S. 915 (1970); K.S.A. 22-3405(1); *State v. Bolton*, 274 Kan. 1, 4-5, 49 P.3d 468 (2002). K.S.A. 22-3405(1) provides in relevant part: "The defendant in a felony case shall be present at the arraignment, at every stage of the trial including the impaneling of the jury and the return of the verdict, and at the imposition of sentence, except as otherwise provided by law." We have interpreted K.S.A. 22-3405(1) to mean:

"[A] felony defendant must be present at any stage of the trial *when the jury is in the courtroom or when the defendant's presence is essential to a fair and just determination of a substantial issue.* The statutory command of K.S.A. 22-3405(1) is analytically and functionally identical to the requirements under the Confrontation Clause and the Due Process Clause of the federal Constitution that a criminal defendant be present at any critical stage of the proceedings against him or her." (Emphasis added.) *Engelhardt*, 280 Kan. 113, Syl. ¶ 2.

In addition to K.S.A. 22-3405(1), K.S.A. 22-3420(3) provides:

"After the jury has retired for deliberation, if they desire to be informed as to any part of the law or evidence arising in the case, *they may request the officer to conduct them to the court, where the information on the point of the law shall be given, or the evidence shall be read or exhibited to them in the presence of the defendant,* unless he voluntarily absents himself, and his counsel and after notice to the prosecuting attorney." (Emphasis added.)

Wells cites both K.S.A. 22-3420(3) and *State v. Coyote*, 268 Kan. 726, 1 P.3d 836 (2000), to support her claim that the district court's decision to send a written answer back to the jury rather than reading the answer in open court violated her right to be present at all critical stages of her trial. The plain language of K.S.A. 22-

3420(3) does not support Wells' contention because the statute only requires the presence of the defendant if the jury, after making a request, is taken into the courtroom so it can receive information from the district court on a point of law. This rule is consistent with our interpretation of K.S.A. 22-3405(1). See *Engelhardt*, 280 Kan. 113, Syl. ¶ 2 ("[A] felony defendant must be present at any stage of the trial when *the jury is in the courtroom* or when the defendant's presence is essential to a fair and just determination of a substantial issue." [Emphasis added.]). Because the jury never asked to be returned to the courtroom so it could be informed on the legal definition of abets, the district court did not violate K.S.A. 22-3420(3) by answering the jury's written question via a written note.

Wells' argument that *Coyote* supports her position is also without merit. In *Coyote*, while the jury was deliberating, it sent a written question to the district court asking for an explanation of an instruction. After briefly discussing the question in chambers with the attorneys but not in the presence of the defendant, the district court sent a written answer back to the jury. We concluded that the district court's failure to answer the jury's question in the presence of the defendant violated his statutory and constitutional rights to be present during a critical stage of his trial. *Coyote*, 268 Kan. at 731-32.

Our holding in *Coyote* was not based on the fact that the district court failed to answer the jury's question orally in open court while the defendant was present. Instead, our holding was based on the fact that the defendant was not present during the court's discussion with the attorneys on how to respond (in writing) to the jury's question. The basis for our holding is reflected in the procedure we outlined in *Coyote* for handling a written question from the jury:

"A trial court, when confronted with a question submitted to it by a jury during deliberations is required to advise counsel, provide the parties with the question, and give them an opportunity for input *in the presence of the defendant. Thereafter, the court is required to respond in writing to the jury in the presence of the defendant.*" (Emphasis added.) *Coyote*, 268 Kan. at 732.

In other words, to ensure that a defendant's constitutional and statutory right to be present at critical stages of his or her trial is protected, a defendant must be present during the court's discussion with the attorneys and ultimate decision on how to respond to a written jury question. But there is no need that the court read the written answer it decided out loud to the jury in open court while the defendant is present. Simply delivering the answer the court decided upon to the jury via written note is sufficient to satisfy the defendant's right to be present. See *Coyote*, 268 Kan. at 731 (noting that the district court's handling of a second written jury question complied with Kansas law; the court's conduct was described as follows: "The court advised counsel and the defendant of the question, provided all with an opportunity off the record for input, and after the hearing, resolved the question submitted. Then the court, *in writing*, answered the jury question." [Emphasis added.]); accord *Burns*, 295 Kan. at 956-57 (approving of procedure outlined in *Coyote* for answering written question from jury).

We conclude that the district court did not violate Wells' constitutional and statutory right to be present during all critical stages of her trial when it answered the jury's question with a written note instead of answering the question in open court while Wells was present. Wells' right to be present was satisfied because she was present during the district court's discussion with the attorneys and ultimate decision on how to answer, in writing, the jury's question.

## CUMULATIVE ERROR

Next, Wells argues that the cumulative effect of the errors committed at her trial substantially prejudiced her right to a fair trial. "Cumulative error will not be found when the record fails to support the errors raised on appeal by the defendant. [Citations omitted.]" *State v. Cofield*, 288 Kan. 367, 378, 203 P.3d 1261 (2009). A single error cannot constitute cumulative error. *State v. Foster*, 290 Kan. 696, 726, 233 P.3d 265 (2010).

Although we concluded that the prosecutor's statements regarding the application of the unanimity instruction to the rape counts were improper, we also concluded that the comments were not so prejudicial as to deny Wells a fair trial. Because one error is not

sufficient to constitute cumulative error, we conclude that cumulative error did not deny Wells the right to a fair trial.

## THE DENIAL OF WELLS' MOTION FOR A DEPARTURE SENTENCE

Wells argues that the district court abused its discretion when it denied her motion for a departure sentence under K.S.A. 21-4643(d) because substantial and compelling reasons existed to justify granting the motion. A district court abuses its discretion if the judicial action:

"(1) is arbitrary, fanciful, or unreasonable, *i.e.*, if no reasonable person would have taken the view adopted by the trial court; (2) is based on an error of law, *i.e.*, if the discretion is guided by an erroneous legal conclusion; or (3) is based on an error of fact, *i.e.*, if substantial competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based." *State v. Ward*, 292 Kan. 541, 550, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012) (citing *State v. Gonzalez*, 290 Kan. 747, 755-56, 234 P.3d 1 [2010]).

### *Applicable Facts*

Prior to sentencing, Wells filed a motion for departure sentence pursuant to K.S.A. 21-4643(d). The motion asserted various grounds supporting departure: a criminal history score of I based on unclassified misdemeanors relating to driving with a suspended license; the influence of alcohol on her criminal activity; her own history of physical and sexual abuse; her participation as an abettor to a dominating personality; her age of 49; and her lack of any future contact with her children.

The district judge denied the motion, stating:

"Well, the court has heard the evidence. I heard the evidence at trial. I heard the evidence in pretrial motions. I am aware of what happened to other members of the family and what happened in this particular case. I don't see any reason for granting a departure. I will deny the motion for a departure."

Notably, at an evidentiary hearing on the State's pretrial motion to present K.S.A. 60-455 evidence, the court heard testimony from one of S.W.'s sisters who testified that Stafford had sexual relations with her when she was 12 or 13 years old while Wells was present in the room and encouraging her to perform the sexual acts. This

sister also testified that Stafford had molested S.W.'s other sister when she was a child.

*Analysis*

Jessica's Law provides that a first-time offender convicted of rape in violation of K.S.A. 21-3502(a)(2) or aggravated criminal sodomy in violation of K.S.A. 21-3506(a)(1) must be sentenced to life imprisonment with a minimum term of not less than 25 years "unless the judge finds substantial and compelling reasons, following a review of mitigating circumstances, to impose a departure." K.S.A. 21-4643(a)(1), (d). K.S.A. 21-4643(d) provides a nonexclusive list of mitigating circumstances a district court may consider when deciding whether to depart from the statutorily prescribed sentence. A district court, however, is not obligated to depart simply because a mitigating factor exists. Rather, a district court has the discretion to either grant or deny the request. In exercising this discretion, a district court first reviews the mitigating circumstances and then weighs those circumstances against any aggravating circumstances, ultimately determining whether substantial and compelling reasons warrant a departure. See *State v. Baptist*, 294 Kan. 728, 733, 280 P.3d 210 (2012). But Jessica's Law does not require a district court to state the reasons why it denied a departure motion; the statute only requires the district court state on the record the substantial and compelling reasons for why it granted a departure motion. See K.S.A. 21-4643(d); *Baptist*, 294 Kan. at 733-35.

Without the second or third prongs of the abuse of discretion standard at issue, Wells essentially asserts no reasonable person would have agreed with the district court's decision in light of the mitigating factors she asserted in support of her departure motion. But based on the evidence the district court heard indicating that Wells had engaged in the same conduct with her older daughter as she had done with S.W., we conclude that reasonable people would agree that denying the departure motion and imposing a hard 25 life sentence pursuant to Jessica's Law was appropriate. Accordingly, we conclude that the district court did not abuse its discretion by denying Wells' departure motion.

## Parole Eligibility After 25 Years

As mentioned above, the district court ordered Wells to serve three concurrent hard 25 life sentences as a result of being convicted of two counts of rape in violation of K.S.A. 21-3502(a)(2) and one count of aggravated criminal sodomy in violation of K.S.A. 21-3506(a)(1). Wells argues on appeal that she should be eligible for parole after 20 years under K.S.A. 22-3717(b)(2) instead of 25 years under K.S.A. 21-4643(a) and K.S.A. 22-3717(b)(5).

After both parties filed their appeal briefs in this case, we rejected this argument in *State v. Hyche*, 293 Kan. 602, 604, 265 P.3d 1172 (2011) (quoting *State v. Cash*, 293 Kan. 326, Syl. ¶ 1, 263 P.3d 786 [2011] ) (" 'Notwithstanding the overlap in the parole eligibility rules contained in K.S.A. 2008 Supp. 22-3717[b][2] and [b][5], an inmate sentenced to an off-grid, indeterminate hard 25 life sentence pursuant to K.S.A. 21-4643 shall not be eligible for parole until that inmate has served the mandatory 25 years in prison.' "). Therefore, we conclude the district court did not err in determining that Wells would be eligible for parole after serving 25 years in prison pursuant to K.S.A. 21-4643(a).

Affirmed.