(305 P.3d 685)
No. 107,848

STATE OF KANSAS, *Appellee*, v. NAAZIR MUHAMMAD JACKSON, *Appellant*.

Opinion filed July 12, 2013.

*Marsha J. Sonner*, legal intern, and *Randall L. Hodgkinson*, of Kansas Appellate Defender Office, for appellant.

*Barry Disney* and *Kendra Lewison*, assistant county attorneys, *Barry Wilkerson*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before STANDRIDGE, P.J., ARNOLD-BURGER and POWELL, JJ.

POWELL, J.: Naazir Jackson appeals his convictions for one count of aggravated robbery, one count of aggravated burglary, and two counts of possession of drug paraphernalia. He argues several points of error: (1) The prosecutor's misconduct during voir dire denied him a fair trial; (2) there was insufficient evidence to support the alternative means for aggravated robbery; (3) the court committed reversible error in answering four written jury questions outside of Jackson's presence; and (4) there was insufficient evidence to support his convictions for possession of drug paraphernalia.

Because we find: First, that the prosecutor's use of a painting analogy was not prosecutorial misconduct; second—with regard to the crime of aggravated robbery—that principal versus aiding and abetting, the phrase "aids or abets" in the aiding and abetting instruction, and the phrase "person or presence" in the aggravated robbery instruction do not constitute alternative means of committing the crime; third, the trial court committed harmless error by answering the jury's questions outside the presence of the de-

fendant; and fourth, there was sufficient evidence to support the defendant's convictions for possession of drug paraphernalia, Jackson's convictions are affirmed.

## FACTUAL AND PROCEDURAL HISTORY

On April 18, 2011, around noon, Christopher Detar-Newbert and Meagan Rocha were in the bedroom they shared in their apartment when Detar-Newbert heard a knock at the door. Looking through the peephole, he saw Jackson, whom he recognized from a prior acquaintance, so he opened the door. When he opened the door, Jackson and a second man were standing close to the door. Detar-Newbert did not recognize the second man, who appeared to have a gun with a blue handkerchief around the gun's visible stock tucked into the top of his pants. Detar-Newbert later described the gun as what he believed to be a black semi-automatic handgun.

Jackson ordered Detar-Newbert to be quiet and go into his room. Detar-Newbert complied, and the two men followed him into his room where Rocha was asleep on the bed. Detar-Newbert woke Rocha, then Jackson ordered them to open the small safe sitting next to the bed. Rocha opened the safe; Jackson proceeded to take the cash and a small bag of marijuana from the safe and put them into the other man's black backpack. Jackson and the second man then left the apartment. Detar-Newbert estimated that there was between $350 to $450 cash and about $20 to $30 worth of marijuana in the safe.

About 30 to 40 minutes later, Detar-Newbert called the police; at 12:58 p.m., Riley County Police Officer Carl Stevens was dispatched to the apartment. When the police arrived, Detar-Newbert provided them with a description of both men who had robbed them. Though neither Detar-Newbert nor Rocha knew Jackson's name, they recognized him as being a friend of a mutual friend, Deangelo Grimm. A couple of months prior to the date of the robbery, Detar-Newbert, Rocha, and their friend Grimm had all been to Jackson's apartment. Then, a couple of weeks before the robbery, Jackson had come to Detar-Newbert and Rocha's apartment with Grimm.

Detar-Newbert and Rocha went with detectives to a neighboring apartment complex and pointed out Jackson's apartment. The detectives ascertained the names of the tenants in that apartment; one of them, Jackson, fit the physical description given by Detar-Newbert and Rocha. A review of the surveillance footage from a few minutes prior to the time of the robbery showed two black males walking from Jackson's apartment complex towards the victims' apartment complex. A short time later, the same two individuals walked past the surveillance cameras in the opposite direction towards Jackson's apartment complex.

Detar-Newbert identified Jackson as one of the robbers when presented with a photo line-up. A search warrant was obtained for Jackson's apartment, and the apartment was searched later that same day. One of the detectives who was positioned outside the door of the apartment testified that he could smell the odor of burnt marijuana emanating from within the apartment. Jackson and the suspected second robber were both found within the apartment. The police searched both men and found $162 in cash on Jackson and $159 in cash on the other man.

When officers searched Jackson's bedroom, they located a box in Jackson's closet that contained a black air pistol (BB gun) that resembled a semi-automatic handgun. Wrapped around the pistol was a blue bandanna. Under the bed was a Wal-Mart bag that contained the packaging from the air pistol and a receipt indicating it was purchased on April 11, 2011—7 days before the robbery. The officers also found a small digital scale on the dresser and some plastic baggies in the top dresser drawer.

Officers found empty packaging from Swisher Sweets cigars and discarded loose tobacco in a trash can. One of the police sergeants, a former narcotics detective, testified at trial that one common way to ingest marijuana is to smoke a "blunt," which is a cigar that has had the tobacco hollowed out and replaced with marijuana. One of the most common brands of cigars used as blunts is Swisher Sweets. The sergeant also testified that it is common for marijuana users to own a small scale and that plastic baggies are the most common container in which marijuana is stored. The sergeant had personally examined the baggies and scale found in the defendant's

bedroom and had observed flecks of green vegetation on the items that were consistent with the appearance of marijuana.

From the area surveillance footage, the detectives identified the second robber as exiting the bus at Jackson's apartment complex at 12:06 p.m., before the robbery occurred. He was wearing a white t-shirt with a very distinct memorial logo on the front, and he was wearing a black Nike backpack with a Nike logo. Officers searched this man's apartment and found the distinctive white t-shirt seen on the video. Other surveillance footage from 12:21 p.m. showed this same man wearing this distinctive white shirt walking with an individual who had long hair roughly the same length as Jackson's hair.

During the weeks that followed Jackson's arrest, he remained in jail and made a number of phone calls. The police monitored these phone calls, and Jackson was aware of this. Jackson made a phone call to his girlfriend, asked her to get in touch with the man identified as the second robber, and find out why he had not been arrested. Jackson also called his mother and told her that the second robber was deeper in "it" than he was and he had a good plan to get the victims to drop the charges.

The trial was held on October 26-27, 2011. During deliberations, the jury sent out four questions by note. These questions were handled between the court and counsel in chambers off the record. The questions and answers were retained in the court file and made part of the record.

The jury convicted Jackson of aggravated robbery, aggravated burglary, and two counts of misdemeanor possession of drug paraphernalia. Jackson was sentenced to a controlling prison term of 94 months with the Kansas Department of Corrections. Jackson's motion for dispositional departure to probation and durational departure was denied.

Jackson timely appeals his convictions asserting four allegations of error.

## DID THE USE OF AN ANALOGY CONCERNING AN INCOMPLETE PAINTING DURING VOIR DIRE CONSTITUTE PROSECUTORIAL MISCONDUCT?

Jackson's first allegation of error is that the prosecutor committed misconduct by using an analogy during voir dire in an attempt to improperly define the burden of proof. Relying on a prior decision of our court, *State v. Crawford*, 46 Kan. App. 2d 401, 262 P.3d 1070 (2011), *petition for rev. granted in part* May 21, 2012, Jackson claims the prosecutor's analogy had the effect of diluting the burden of proof.

### Standard of Review

The Kansas Supreme Court has recently reaffirmed the two-step analysis an appellate court must use in evaluating allegations of prosecutorial misconduct during voir dire. *State v. Stevenson*, 297 Kan. 49, 51, 298 P.3d 303 (2013). "First, the court determines whether the prosecutor's comments were outside the wide latitude allowed in discussing the evidence. Second, if misconduct is found, the appellate court determines whether those comments constitute plain error . . . ." *Stevenson*, 297 Kan. 51 (citing *State v. Burnett*, 293 Kan. 840, 850, 270 P.3d 1115 [2012]).

### Analysis

#### Prosecutor's Wide Latitude

It is common for prosecutors to use analogies to help explain the concept of beyond a reasonable doubt during trial. However, our Supreme Court has found "that prosecutors embellish on the definition of the burden of proof in criminal cases at their peril." *State v. Magallanez*, 290 Kan. 906, 914, 235 P.3d 460 (2010). An "argument designed to define reasonable doubt . . . with unusual or seemingly clever analogies" is a dangerous path for prosecutors. *Crawford*, 46 Kan. App. 2d at 416.

In this case, Jackson argues that the prosecutor's use of an analogy to define the beyond a reasonable doubt standard by employing a painting of George Washington with some flakes of the paint missing diluted the burden of proof and constitutes prosecutorial

misconduct. During voir dire the following exchange took place between the prosecutor and prospective jurors:

"Q: . . . [The defendant is] obviously charged with a crime. Ms. [P.], that doesn't mean that he's guilty. It is just simply an allegation of the State making it. Do you understand that?

"A : Uh-huh.

"Q: It's our responsibility to prove beyond a reasonable doubt that he is guilty. Are you presuming that the defendant is guilty just because we have charged him?

"A: No.

"Q: Okay. Is there anyone who has trouble with that concept? Obviously, there is going to be evidence but we have to prove it and you can't give the State, Ms. [P.], a head start. You can't say well if they charge him that he must be guilty. We start at square one. Do you understand that?

"A: Right.

. . . .

"Q: . . . Ms. [H], who is Bob Ross?

. . . .

"A: He's a painter on TV.

"Q: . . . When he starts [painting] that he starts with a blank canvas and . . . when the Judge talks about presumption of innocence . . . what I would like [you] to think of is that it's a blank canvas. We don't know what is going to be painted but you got to presume that he's innocent. And then we put on evidence, as the trial progresses [ ] we'll have one witness who will get up and put a little bit of paint, a little bit of evidence on the canvas. We'll have another one. Eventually, a picture will start to form. And Ms. [W], your job then at the end of the trial is to sit back and determine has the State shown me a picture that I know what it is beyond a reasonable doubt. Do you understand that?

"A: Yes.

"Q: Have you ever seen that picture of George Washington and at the very bottom that there is no paint on it? Have you ever seen that?

"A: No.

"Q: I think that they had to move it from the White House when the British invaded. Does anyone know the picture I'm talking about? You can still tell that [it] is George Washington, correct, even though that there might be a little spot on the painting that is missing? Mr. [H], you could say beyond a reasonable doubt who that was, right?

"A: Absolutely. Yes.

"Q: And so Ms. [W], when the Judge says that we have to prove our case beyond a reasonable doubt, you realize that not every little corner of the painting has to have paint on it. Do you understand that?

"A: Yeah.

"Q: As long as you can tell beyond a reasonable doubt what it is?

"A: Yes."

Jackson argues that this use of the George Washington painting analogy is outside the scope of a prosecutor's latitude because it is similar to the analogy that this court held to be prosecutorial misconduct in *Crawford*.

In *Crawford*, the defendant claimed that he was denied a fair trial because the prosecutor committed reversible prosecutorial misconduct by "misrepresenting the definition of reasonable doubt and minimizing the standard of proof during voir dire and closing argument." 46 Kan. App. 2d at 409. During voir dire, the prosecutor and prospective jurors had the following discussion:

" 'Q: Okay. You have seen jigsaw puzzles. Have you seen jigsaw puzzles where maybe one or two pieces, a couple pieces are missing throughout the puzzle?
" 'A: I don't know. I suppose.
" 'Q: Okay. Go with me here then, just go with me for a second. We have got a big puzzle like this, the scene is a lighthouse and the ocean and the waves crashing against the rocks, a [*sic*] there's couple gulls flying around. Got that?
" 'A: Got it.
" 'Q: Okay. If you're missing some of the pieces to the lighthouse and some of the pieces to the ocean, do you then say, well, that just can't be a lighthouse and an ocean because there's some pieces missing?
" 'A: No.
" 'Q: . . . [S]o even though there's some pieces missing, you're able to say that looks like a lighthouse and an ocean?
" 'A: Yeah, I'm sure.
" 'Q: That's kind of what I'm talking about is reasonable doubt. There's probably always going to be some question something that doesn't get answered. The question is, when you put the pieces together, even if there are some pieces missing, does that mean it didn't happen? No. So—and that's kind of why I bring that up. Thanks.' " 46 Kan. App. 2d at 411-12.

The prosecutor also referred to the jigsaw puzzle analogy in closing arguments by stating:

" 'You get to determine credibility of witnesses, and when I talked in voir dire about the jigsaw puzzle, and the scene with the lighthouse and the ocean, there are always going to be pieces of the puzzle missing because none of us were there. None of you were there. The question you got to ask yourself is just because a piece of the puzzle—pieces of the puzzle are missing, does that mean you can't see the whole picture? Are those questions reasonable in your mind?' " 46 Kan. App. 2d at 412.

The *Crawford* court held this constituted prosecutorial misconduct because the prosecutor suggested through the use of his analogy in voir dire and in closing arguments that the jury may convict the defendant if it " 'looked like' " he committed the crimes. The prosecutor cannot suggest to the jury that it might convict on anything less than proof beyond a reasonable doubt. 46 Kan. App. 2d at 414.

Jackson claims that the analogy of a painting of George Washington is extremely similar to the jigsaw puzzle analogy used in *Crawford* and therefore reduced the State's burden by telling the jurors that they can convict as long as they get the overall point the prosecution is attempting to prove. Since the court found the jigsaw puzzle analogy constituted misconduct, Jackson claims that the painting analogy should also constitute misconduct.

The State argues that *Crawford* cannot be interpreted to mean the prohibition of all use of analogies by prosecutors when explaining reasonable doubt, especially when solely used in the voir dire process. The State distinguishes this present case from *Crawford* by pointing out that the misconduct in *Crawford* came during closing arguments when the prosecutor urged the jury to convict if it " 'looked like' " the defendant committed the crime. But, in this case, the prosecutor did not refer to the painting analogy in closing arguments, and during voir dire the prosecutor stressed that the State must prove each element and find guilt beyond a reasonable doubt.

This case is also similar to *Stevenson*. In *Stevenson*, during voir dire, the prosecutor showed the jury a sign with the words "Wheel of Fortune" printed on it but with one letter missing. The prosecutor pointed out that, although there was a letter missing, there was no reasonable doubt about which letter was needed to complete the title. The prosecutor continued:

" 'As to reasonable doubt, when we apply that standard, does anybody think that I'm going to have to have a videotape of exactly how everything happened? It would be impressive if I did, right? If you were there, you saw every step of the way, that would be beyond all doubt.

" 'Does anybody think that I have to put you in that position?

. . . .

" '. . . Now, what if in your mind I have put on enough evidence to prove beyond a reasonable doubt that it occurred this way. Okay. So you are to that point, you've made your decision beyond a reasonable doubt.

" 'But then you say you know what, I wish they would have done whatever. Okay . . . I guess the question I'm asking is do you think there's always something you could do in an investigation for instance?

" 'PROSPECTIVE JUROR . . . : I would say up to a point. But at some point in time there's just nothing else you can do.' " *Stevenson*, 297 Kan. at 52.

"The prosecutor followed up this exchange by asking, 'Does everybody understand what I'm trying to say here? That I have to put on enough evidence to prove beyond a reasonable doubt? I do not have to put on every possible piece of evidence in existence . . . .' " *Stevenson*, 297 Kan. at 53.

From reviewing the exact questions and wording used by the prosecutor during voir dire, our Supreme Court concluded that the prosecutor was "drawing a distinction between the concept of proof beyond a reasonable doubt and proof beyond all doubt, rather than attempting to provide a meaning for 'reasonable doubt.' " *Stevenson*, 297 Kan. at 53. The analogy stated the prosecutor's burden and did not misstate the law; therefore, the analogy did not fall outside the wide latitude afforded prosecutors. Because the analogy was inside the prosecutor's wide latitude, the court did not analyze the second step in the prosecutorial misconduct analysis. *Stevenson*, 297 Kan. at 54-55.

Similar to the *Stevenson* analogy, in this case the prosecutor's analogy and comments about the painting of George Washington also served to explain to the potential jury members that the prosecutor's burden was not one to show proof beyond all doubt. The prosecutor clarified, " '[W]hen the Judge says that we have to prove our case beyond a reasonable doubt, you realize that not every little corner of the painting has to have paint on it.' " The prosecutor stressed that the defendant was presumed innocent, it was the State's burden to put paint on that " 'blank canvas' " of innocence, and it was the jury's responsibility to decide whether the picture presented by the State was identifiable beyond a reasonable doubt. In no way did the prosecutor attempt to diminish the State's burden of proof or try to explain the possible differences between how

much paint verses blank space might rise to the level of beyond a reasonable doubt. Moreover, the prosecutor never mentioned the painting analogy after voir dire, and the jury was given a correct statement of the law regarding reasonable doubt in the jury instructions. As used in this particular case, the George Washington painting analogy falls within the wide latitude afforded prosecutors and, therefore, does not constitute prosecutorial misconduct. See also *State v. Galloway*, No. 106,895, 2013 WL 517699, at *2-4 (Kan. App. 2013) (unpublished opinion) (use of President Obama's birth certificate controversy as analogy to define reasonable doubt not error).

*Plain Error Analysis*

Even if we held this analogy to be outside the wide latitude afforded to prosecutors, the misconduct was not so prejudicial that it denied Jackson fair trial. See *Stevenson*, 297 Kan. at 54 (statements may not be so prejudicial as to deny defendant a fair trial). In making this determination we must consider three factors: (1) whether the misconduct was gross and flagrant; (2) whether the misconduct showed ill will on the prosecutor's part; and (3) whether the evidence was of such a direct and overwhelming nature that the misconduct would likely have had little weight in the minds of jurors. *State v. Brinklow*, 288 Kan. 39, 44, 200 P.3d 1225 (2009).

Jackson claims that the prosecutor's conduct was gross and flagrant because the prosecutor used this analogy only 1 month after a panel of this court issued the *Crawford* decision. However, our Supreme Court has stated: "With regard to the first factor—whether the misconduct was gross and flagrant—we consider whether the misconduct was repeated, was emphasized, violated a long-standing rule, violated a clear and unequivocal rule, or violated a rule designed to protect a constitutional right." *State v. Stafford*, 296 Kan. 25, 58-59, 290 P.3d 562 (2012) (citing *State v. Marshall*, 294 Kan. 850, Syl. ¶ 6, 281 P.3d 1112 [2012]). There was no long-standing rule, a clear and unequivocal rule, or a rule protecting constitutional rights here, so the prosecutor's comments were not gross and flagrant.

The second factor is whether a prosecutor's misconduct was motivated by ill will. "In analyzing [this factor], we consider whether the misconduct was deliberate, repeated, or in apparent indifference to a court's ruling." *Stafford*, 296 Kan. at 59. There is no evidence to support that the prosecutor's comments were showing indifference to the court's ruling or deliberately against this court's ruling in *Crawford*. The prosecutor did not use the jigsaw puzzle analogy, and he did not repeat any aspect of the painting analogy at any other time during the trial.

The last factor is whether the evidence was of such a direct and overwhelming nature that the misconduct would likely have had little weight in the minds of the jurors. "[T]he State, as the party benefitting from the prosecutorial misconduct, bears the burden to establish beyond a reasonable doubt that the error did not affect the defendant's substantial rights, *i.e.*, there is no reasonable possibility the error affected the verdict.'" *Stafford*, 296 Kan. at 59 (quoting *State v. Inkelaar*, 293 Kan. 414, 431, 264 P.3d 81 [2011]).

The State argues that the prosecutor's comments were very brief. After the comments were made, the defense attorney had many opportunities to discuss the beyond a reasonable doubt standard and even ask potential jurors individually whether they would hold the State to the burden of proof beyond a reasonable doubt.

Furthermore, the evidence presented at trial directly and overwhelmingly pointed to Jackson having committed the charged offenses. The two victims both positively identified Jackson as one of the men in their apartment and testified to witnessing Jackson take the cash and marijuana out of their bed-side safe. The victims had been to Jackson's apartment before and were able to show the police which apartment was his. When the police searched Jackson's apartment, the smell of burnt marijuana was in the apartment, the man later identified as the other man with Jackson in the victims' apartment was in Jackson's apartment, and a search of both men turned up about the same amount of cash that had been taken from the victims' safe. Inside Jackson's room, the police also found the blue bandanna wrapped around the very real-gun-looking air pistol that the victims testified the two men used to intimidate them.

Therefore, even if this court were to hold that the painting analogy was outside of the wide latitude given to prosecutors, the conduct was neither gross and flagrant nor motivated by ill will, and there was overwhelming evidence that allowed the jury to find beyond a reasonable doubt that Jackson was guilty.

## DID THE JURY INSTRUCTIONS ON AGGRAVATED ROBBERY PRESENT ALTERNATIVE MEANS, AND, IF SO, IS THERE SUFFICIENT EVIDENCE TO SUPPORT EACH ALTERNATIVE MEANS?

Jackson's second allegation of error asserts that we must reverse his conviction of aggravated robbery because the district court instructed the jury on alternative means of committing the crime and the State failed to present sufficient evidence of each alternative means. Jackson identifies three instances of alternative means: (1) principal versus aiding and abetting; (2) the phrase "aids or abets" in the aiding and abetting instruction; and (3) the phrase "person or presence" in the aggravated robbery instruction. For the reasons more fully explained below, we find none of these instances constitutes alternative means and therefore find there was sufficient evidence to convict Jackson of aggravated robbery.

*Standard of Review*

In Kansas, a criminal defendant has the right to a unanimous jury verdict. See K.S.A. 22-3421. However, this right is not a federal or state constitutional right, but a statutory one. *State v. Voyles*, 284 Kan. 239, 250, 160 P.3d 794 (2007). An alternative means issue can arise when a single offense may be committed in multiple ways. *State v. Timley*, 255 Kan. 286, 289, 875 P.2d 242 (1994). " '[W]here a single offense may be committed in more than one way, there must be jury unanimity as to *guilt* for the single crime charged. Unanimity is not required, however, as to the *means* by which the crime was committed so long as substantial evidence supports each alternative means. [Citations omitted.]' " *Timley*, 255 Kan. at 289 (quoting *State v. Kitchen*, 110 Wash. 2d 403, 410, 756 P.2d 105 [1988]). The State must meet the " 'super-sufficiency of the evidence' requirement" for each means. *State v. Swindler*, 296 Kan.

670, 676, 294 P.3d 308 (2013). "If the State fails to present sufficient evidence to support each means, reversal is required." *Swindler*, 296 Kan. at 676 (citing *State v. Rojas-Marceleno*, 295 Kan. 525, 544, 285 P.3d 361 [2012]). "This safeguard prevents a jury, partially or wholly, from reaching a finding of guilt based on insufficient evidence." *State v. Snover*, 48 Kan. App. 2d 298, 300, 287 P.3d 943 (2012), *petition for rev. filed* December 10, 2012.

Deciding whether a case of alternative means exists requires statutory interpretation over which the appellate courts have unlimited review. *State v. Brown*, 295 Kan. 181, 193-94, 284 P.3d 977 (2012).

"And because alternative means questions are ultimately resolved on the sufficiency of the evidence, that standard of review is whether, after considering all of the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt on each of the alternative means presented." *State v. Cato-Perry*, 48 Kan. App. 2d 92, 94-95, 284 P.3d 363 (2012) (citing *State v. McCaslin*, 291 Kan. 697, 710, 245 P.3d 1030 [2011]).

*Analysis*

*Aiding and Abetting as Alternative Means to Principal Liability*

First, Jackson argues that the district court instructed the jury to convict him of aggravated robbery if it found Jackson "intentionally took property from the person or presence of Christopher David Detar-Newbert and Meagan Lyn Rocha" as either a principal or as an aider or abettor, thereby creating alternative means upon which he could have been found guilty of aggravated robbery. The State argues that the aiding and abetting statute, K.S.A. 21-3205(1) (this statute was repealed and recodified in July 2011, but this crime was committed in April 2011), from which the jury instructions were based, does not create alternative means of committing aggravated robbery.

This is not the first time the question of whether aiding and abetting, as opposed to being a principal, is an alternative means of committing the crime has been before this court. Various panels of this court have differed on this issue. *E.g.*, *Snover*, 48 Kan. App. 2d at 303 (aiding and abetting is not an alternative means); *Cato-Perry*, 48 Kan. App. 2d at 96 (aiding and abetting is an alternative

means); *State v. Boyd,* 46 Kan. App. 2d 945, 953-54, 268 P.3d 1210 (2011) (aiding and abetting is an alternative means), *petition for rev. filed* January 23, 2012, *cross-petition for rev. filed* February 6, 2012; *State v. Kittman,* No. 107,519, 2013 WL 1339902, at *4 (Kan. App. 2013) (unpublished opinion) (aiding and abetting is not an alternative means), *petition for rev. filed* April 29, 2013. See also *State v. Gonzalez,* No. 104,612, 2012 WL 3822474, at *10 (Kan. App. 2012) (unpublished opinion) (panel divided on question of whether aiding and abetting is an alternative means).

In *Boyd,* the panel found aiding and abetting under K.S.A. 21-3205(1) to be an alternative means to conviction as a principal. While acknowledging that "aider and abettor liability applies to pretty much every substantive criminal offense," the panel concluded there is the danger that jurors who might favor conviction of the defendant as an aider or abettor rather than as a principal would actually choose acquittal rather than conviction if the aiding and abetting option was not present. *Boyd,* 46 Kan. App. 2d at 953-54. While admittedly such logic has some appeal, we must respectfully disagree because "the long history of Kansas law on this subject does not support the conclusion that aiding and abetting is an alternative means of committing a crime." *Cato-Perry,* 48 Kan. App. 2d at 99 (Ward, J., dissenting).

Because jury unanimity is not a constitutional right, our court may extend alternative means protection to the area of aiding and abetting only by interpreting K.S.A. 21-3205(1): "A person is criminally responsible for a crime committed by another if such person intentionally aids, abets, advises, hires, counsels or procures the other to commit the crime."

Since statehood, the aiding and abetting statute has meant that " '[t]he one acting, the one present, aiding and abetting, and the one absent, counseling, aiding and abetting, are declared to be equally and alike guilty.' " *Cato-Perry,* 48 Kan. App. 2d at 99 (Ward, J. dissenting) (quoting *State v. Cassady,* 12 Kan. 550, 556, 1874 WL 666 [1874]); see also *State v. Robinson,* 293 Kan. 1002, 1037-38, 270 P.3d 1183 (2012) (under shared accomplice liability, all persons involved are equally as responsible for all the actions of the others); *State v. Williams & Reynolds,* 217 Kan. 400, 404, 536

P.2d 1395 (1975) (all participants in crime equally guilty without regard to extent of their participation); *State v. Turner*, 193 Kan. 189, 196, 392 P.2d 863 (1964) (all participants in the crime equally guilty); *State v. Wolkow*, 110 Kan. 722, 726, 205 Pac. 639 (1922) (out-of-state aider and abettor equally guilty as in-state principals); *State v. Roberts*, 95 Kan. 280, 288, 147 Pac. 828 (1915) (all participants equally guilty regardless of extent of their participation). As a result, our state's jurisprudence has not distinguished between principal liability and aider and abettor liability. *State v. Jackson*, 201 Kan. 795, 799, 443 P.2d 279 (1968) (one who aids and abets may be treated as principal); *State v. Potter*, 15 Kan. 302, 321, 1875 WL 811 (1875) (aider and abettor may be regarded by jury as a principal). Therefore, "prosecutors have generally not bothered to distinguish between principals and aiders and abettors in charging codefendant cases." *Cato-Perry*, 48 Kan. App. 2d at 100 (Ward, J., dissenting); see also *State v. Gant*, 288 Kan. 76, 83, 201 P.3d 673 (2009) (aider and abettor may be charged as principal); *State v. Green*, 254 Kan. 669, 687, 867 P.2d 366 (1994) (person who aids and abets may be charged as principal); *State v. Garcia*, 243 Kan. 662, 666, 763 P.2d 585 (1988) (aider and abettor may be convicted as a principal); *State v. Goering*, 225 Kan. 755, 758-59, 594 P.2d 194 (1979) (aider and abettor may be charged, tried, and convicted in same manner as principal); *State v. Cook*, 149 Kan. 481, 483-84, 87 P.2d 648 (1939) (aider and abettor may be charged as principal); *Snover*, 48 Kan. App. 2d at 303 (person charged as principal may be convicted as aider and abettor if supported by the evidence).

"All that has historically mattered is that the State proves each element of the crime and the defendant on trial played a willing role in the commission or furtherance of the crime as either the principal or as the aider and abettor. To be guilty under the theory of aiding and abetting, a defendant 'must willfully and knowingly associate himself with the unlawful venture and willfully participate in it as he would in something he wishes to bring about or to make succeed.' " *Cato-Perry*, 48 Kan. App. 2d at 100 (Ward, J., dissenting) (quoting *State v. Schriner*, 215 Kan. 86, Syl. ¶ 6, 523 P.2d 703 [1974]).

Moreover, just 3 months after the *Boyd* decision, our Supreme Court held that aiding and abetting under K.S.A. 21-3205(1) does

not create a separate crime but, rather, "extends criminal liability to a person other than the principal actor." *Robinson*, 293 Kan. at 1038. The United States Court of Appeals for the Tenth Circuit has interpreted the federal aiding and abetting statute, 18 U.S.C. § 2 (2006), in a similar fashion. See *United States v. Scroger*, 98 F.3d 1256, 1262 (10th Cir. 1996).

More recently, the panel in *Snover* also disagreed with the *Boyd* analysis. The *Snover* panel started from the underlying premise of accomplice liability—all participants in a crime are equally guilty without regard to the extent of each one's participation. The panel further pointed out that the aiding and abetting statute, K.S.A. 21-3205(1), does not define a separate crime; it merely " 'explains the circumstances under which a person may be criminally responsible for a crime committed by another person.' " *Snover*, 48 Kan. App. 2d at 302. Of particular note to the *Snover* panel was the fact that the Supreme Court of Washington, the same court *Timley* favorably cited regarding the alternative means doctrine, has held principal and accomplice liability are not alternative means of committing an offense. See *State v. McDonald*, 138 Wash. 2d 680, 687, 981 P.2d 443 (1999). The Washington court reasoned that extending the alternative means doctrine to accomplice liability would contradict its holdings concerning "the emptiness of any distinction between principal and accomplice liability." 138 Wash. 2d at 687-88. Applying the same reasoning, the *Snover* panel concluded that applying the alternative means doctrine would contradict the well-settled law in this state regarding criminal liability. Accordingly, the *Snover* panel held the aiding and abetting statute does not create alternative means of committing a single offense. 48 Kan. App. 2d at 303. We adopt this reasoning.

Finally, very recently and after the decisions in *Boyd* and *Snover*, our Supreme Court in *Brown* clarified the test to be used when examining whether a criminal statute contains alternative means of committing the crime:

"[A] court must analyze whether the legislature listed two or more alternative distinct, material elements of a crime—that is, separate or distinct *mens rea, actus reus*, and, in some statutes, causation elements. Or, did the legislature list options within a means, that is, options that merely describe a material element or describe

a factual circumstance that would prove the element? The listing of alternative distinct, material elements, when incorporated into an elements instruction, creates an alternative means issue demanding super-sufficiency of the evidence. Often this intent can be discerned from the structure of the statute. On the other hand, the legislature generally does not intend to create alternative means when it merely describes a material element or a factual circumstance that would prove the crime. Such descriptions are secondary matters—options within a means—that do not, even if included in a jury instruction, raise a sufficiency issue that requires a court to examine whether the option is supported by evidence." *Brown*, 295 Kan. at 199-200.

Conducting this analysis as directed by *Brown* strengthens our conclusion that aiding and abetting does not constitute an alternative means of committing a crime. First, the aiding and abetting statute does not set out alternative material elements of the underlying crime. Second, K.S.A. 21-3205(1), describing one who "intentionally aids, abets, advises, hires, counsels or procures" another to commit a crime with intent to promote or assist in its commission, merely provides descriptors as to how a person participates in the crime. Third, and more fundamentally, K.S.A. 21-3205(1) only provides factual circumstances that impose equal liability on a person who aids and abets the principal actor. Accordingly, in Jackson's case, we hold the jury instruction on aiding and abetting did not create an alternative means of committing the crime of aggravated robbery, and the super-sufficiency requirement does not apply.

### "Aids or Abets" as Alternative Means

Second, Jackson argues that the phrase "aids or abets" in the aiding and abetting instruction constitutes alternative means of committing aggravated robbery and there was insufficient evidence to convict him of abetting in the crime. We find this claim of error also without merit for the rationale set forth by another panel of our court in *State v. Johnson*, 46 Kan. App. 2d 870, 885-86, 265 P.3d 585 (2011).

In *Johnson*, the defendant was convicted of aggravated battery. Among her contentions of error on appeal, Johnson argued that there was insufficient evidence to support her conviction by aiding and abetting, claiming the aiding and abetting statute set forth

alternative means to commit the crime. After conducting an analysis of the history of aiding and abetting similar to what we have done above, the court concluded:

"Although there are minor differences in the meaning of the terms 'aids,' 'abets,' 'advises,' 'hires,' 'counsels,' and 'procures,' we find that these terms do not entail materially different or distinct ways of committing a particular crime. The thrust of K.S.A. 21-3205 is that a person who knowingly induces or assists another person to commit a crime is criminally responsible for the crime regardless of the extent the person participates in the actual commission of the crime. We conclude that K.S.A. 21-3205(1) does not set forth alternative means of committing a crime." 46 Kan. App. 2d at 885-86.

We agree with this analysis as it comports with our Supreme Court's command in *Brown* to determine whether there are "two or more alternative distinct, material elements of a crime" versus merely a listing of "options within a means." 295 Kan. at 200. We hold that the words "aids" or "abets" as they appear in the aiding and abetting statute are not alternative means of committing the crime of aggravated robbery.

*"Person or Presence" as Alternative Means*

Third, Jackson argues that the element of taking property from the "person or presence" of the victims in the aggravated robbery instruction also raises an alternative means issue. Jackson relies on *State v. Robinson*, 27 Kan. App. 2d 724, 728, 8 P.3d 51 (2000), which held that the taking of property from an individual's "person" is more restrictive than taking property from an individual's "presence." Conversely, the State argues that alternative means are not created by the phrase "person or presence" and relies on the more recent case of *Boyd*, in which the court held that "taking property from the person or the presence" of the victim does not create alternative means. 46 Kan. App. 2d at 950.

In *Robinson*, the issue before the court concerned what the State must prove when the jury instruction on robbery only included the language of taking from the victim's "person" and omitted the "presence" language. In that situation, the State must specifically prove that the property taken was indeed from the victim's person rather than the victim's general presence. *Robinson*, 27 Kan. App. 2d at 727-28. However, the *Robinson* panel only conducted a suf-

ficiency of the evidence analysis as it specifically applied to a tailored jury instruction. It did not conduct an alternative means analysis; therefore, it does not apply in this case. See *State v. Saudy*, No. 105,603, 2012 WL 6734503, at *5 (Kan. App. 2012) (unpublished opinion) (*Robinson* court dealt with an instruction error and not alternative means), *rev. granted* May 20, 2013 (on State's cross-petition for review on intent to take issue).

The use of "person or presence" describes the victim's proximity to the property taken. When conducting the *Brown* analysis on this point, it is apparent that the two words are simply two options used to describe different factual circumstances in which aggravated robbery (or robbery) can occur.

"The essence of the crime [of robbery] is forcibly taking property when a person is present. The term 'from the person or the presence' of the victim describes the proximity of the property and the individual. It does so with phraseology that overlaps. Taking property from the presence of the victim (who need not be the owner of whatever the perpetrator seizes) describes an area in the general vicinity of the victim. Taking property from the person of the victim refers to the immediate environs of the body such as a pocket, a purse, or the hands. Thus, a taking 'from the person' is actually encompassed within a taking 'from the presence' of the victim. The robbery and aggravated robbery statutes would criminalize the same range of conduct even if the phrase 'the person' had been omitted from the definitions of those crimes. Accordingly, taking property from the person of the victim and taking property from the presence of the victim do not constitute alternative means of committing aggravated robbery.

". . . Taking property from the presence of the victim is a comparable umbrella term covering taking property from the person of the victim. The *Schreiner* court recognized some degree of redundancy may be tolerated in criminal statutes to enhance the objective of giving fair notice of the proscribed conduct. [Citation omitted]." *Boyd*, 46 Kan. App. 2d at 950-51 (citing *State v. Schreiner*, 46 Kan. App. 2d 778, 785, 264 P.3d 1033 [2011]).

Moreover, the *Boyd* panel emphasized the historical difference between robbery—or in the present case, aggravated robbery—and theft in determining the *actus reus* of robbery. "Robbery entailed obtaining the property from the individual by a direct threat or application of force. The crime created a volatile, potentially deadly confrontation." 46 Kan. App. 2d at 951. "In contrast, theft . . . entailed no such danger to the victim. The thief worked by stealth and secured the victim's property without his or her knowl-

edge. [Citation omitted]." 46 Kan. App. 2d at 951. "The legislature's use of the phrasing 'taking property from the person or the presence of another' merely serves to criminalize the peril associated with the crimes of robbery and aggravated robbery. We reject [the defendant's] argument that alternative means lurk somewhere beneath that statutory language." 46 Kan. App. 2d at 951-52.

The *Boyd* court's analysis of "person or presence" has been followed by multiple panels of our court to show that the phrase "person or presence" does not create alternative means of committing the crime. See *State v. Edwards*, 48 Kan. App. 2d 383, Syl. ¶ 5, 290 P.3d 661 (2012), *rev. granted* May 20, 2013; *State v. Moore*, No. 106,209, 2013 WL 1010284, at *3-4 (Kan. App. 2013) (unpublished opinion), *petition for rev. filed* April 8, 2013; *Saudy*, 2012 WL 6734503, at *5; *State v. Delacruz*, No. 106,082, 2012 WL 1352865, at *4-5 (Kan. App. 2012) (unpublished opinion), *petition for rev. filed* May 10, 2012.

We agree with the *Boyd* panel's excellent analysis on this point because it comports with the *Brown* test on alternative means. We hold that the phrase "person or presence" in the aggravated robbery statute does not create an alternative means of committing the crime. Therefore, since no alternative means issue is present in this case, there is no need to weigh the sufficiency of the evidence regarding whether the defendant took property from the person *or* the presence of the victims. The record clearly supports that Jackson took the property out of the victims' safe which was sitting next to the bed on which the victims were sitting. Accordingly, there was sufficient evidence to establish that the property was taken from the presence of the victims, which is all that is needed to satisfy that element of aggravated robbery.

### DID THE TRIAL COURT COMMIT ERROR BY ANSWERING THE JURY'S QUESTIONS IN WRITING OUTSIDE THE PRESENCE OF DEFENDANT?

Jackson's third allegation of error is that the district court violated his statutory and constitutional right to be present during every critical stage of the trial by formulating answers to the jury's questions with counsel off the record, in chambers, and outside his

presence. The State replies that there was no error, but if there was, it was harmless.

## Standard of Review

A defendant has a constitutional and statutory right to be present at every stage of his trial. U.S. Const. Amend. VI; K.S.A. 22-3405. "A claim that a defendant was deprived of his or her statutory and constitutional right to be present during a portion of the trial raises legal questions that are subject to unlimited review on appeal." *State v. Wells*, 296 Kan. 65, 89, 290 P.3d 590 (2012). If there was indeed a violation of the defendant's rights, the error is then subject to the same harmless error analysis as other constitutional violations. See *State v. Adams*, 292 Kan. 151, 164, 254 P.3d 515 (2011).

## Analysis

During deliberations, the jury asked four questions to the judge, each via a written note. The district court and counsel addressed each of the questions in the judge's chambers and off the record. The judge wrote the answer on the same sheet of paper containing the jury's question, and the paper was returned to the jury. The four questions from the jury and each answer were:

Question #1: "Did [the victims] have to ask the defendant to leave in order to remove authority."
Answer #1: "You must decide this case based on the evidence as you remember it and the instructions given."
Question #2: "Are we permitted to make a determination or have an opinion on the truthfulness of testimony."
Answer #2: "Please refer to instruction No. 2."
Question #3: "What is the legal definition of 'resionable [*sic*] doubt?' "
Answer #3: "There is no legal definition for 'reasonable doubt.' "
Question #4: "May we see the 'baggies'?"
Answer #4: "We are having that exhibit returned. It was inadvertently sent back to the RCPD. The bailiff will bring it to you when it arrives."

## Violation of Jackson's Right to Be Present

K.S.A. 22-3420(3) sets out a defendant's statutory rights:

"After the jury has retired for deliberation, if they desire to be informed as to any part of the law or evidence arising in the case, they *may* request the officer to conduct them to the court, where the information on the point of the law shall be given, or the evidence shall be read or exhibited to them in the presence of

the defendant, unless he voluntarily absents himself, and his counsel and after notice to the prosecuting attorney." (Emphasis added.)

Jackson claims that it was error for the trial court to answer the jury's questions using a written note rather than in open court. K.S.A. 22-3420(3) neither requires that the jury be brought back into the courtroom in order to ask the court a question, nor does it require that the judge only respond to the jury's questions in open court. *Wells*, 296 Kan. at 91. The possible violation in this case is not whether the court should have answered the questions in the courtroom or in writing, but, rather, whether the defendant was present or voluntarily absent when the court's answers were discussed and written in chambers. See *State v. Coyote*, 268 Kan. 726, 732, 1 P.3d 836 (2000); *State v. Bell*, 266 Kan. 896, 919, 975 P.2d 239, *cert. denied* 528 U.S. 905 (1999).

The Kansas Supreme Court set out the following rule to protect defendants' right to be present:

"A trial court, when confronted with a question submitted to it by a jury during deliberations is required to advise counsel, provide the parties with the question, and give them an opportunity for input in the presence of the defendant. Thereafter, the court is required to respond in writing to the jury in the presence of the defendant." *Coyote*, 268 Kan. at 732.

Our Supreme Court upheld and applied the *Coyote* rule in *Wells*. The *Wells* jury asked for the definition of "abets." The defendant was present during the court's discussion with the attorneys and, over the defense attorney's objection, the court sent a definition back to the jury. Because Wells was present during the discussion, the court held her rights were not violated. 296 Kan. at 92.

In this case, the State argues that the record is insufficient to establish whether Jackson was present in chambers when the judge and attorneys discussed and answered the jury questions. The State claims that if the transcript is completely silent, it is insufficient; therefore, the claim of error fails. The State is incorrect.

If the record is silent regarding whether the defendant was present or absent during the discussion in chambers between the judge and the attorneys, then the court will presume that the defendant

was not present. *State v. Betts*, 272 Kan. 369, 391, 33 P.3d 575 (2001), *overruled on other grounds by State v. Davis*, 283 Kan. 569, 158 P.3d 317 (2006). A defendant may voluntarily waive his or her right to be present, but if the record does not reflect that the defendant personally waived the right or his or her attorney waived it after consulting his or her client, then a waiver will not be presumed from a silent record. *State v. Acree*, 22 Kan. App. 2d 350, 353, 916 P.2d 61, *rev. denied* 260 Kan. 995 (1996).

In this case, there is no mention in the record of Jackson being or not being in chambers with the judge and attorneys when the jury questions were discussed and answered. There is no record of his attorney discussing the questions with his client or Jackson voluntarily waiving his right to be present. Therefore, under the presumption that where the record is silent, the defendant is not present, Jackson is presumed to have been absent from the chambers; thus, his rights were violated.

*Harmless Error Test*

The degree of certainty by which the court must find a constitutional error is harmless beyond a reasonable doubt that there was no impact on the trial's outcome. In other words, the court must find there is no reasonable possibility that the error contributed to the verdict. *State v. Ward*, 292 Kan. 541, 569, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012). Moreover, the party benefiting from the error has the burden of production to prove beyond a reasonable doubt that the constitutional error did not contribute to the verdict obtained. 292 Kan. at 569.

In *Bell*, 266 Kan. 896, the trial court responded to the jury's question outside the presence of the defendant, but the court's answer accurately stated the law and placed no undue emphasis on the defendant's guilt or innocence. The *Bell* court concluded beyond a reasonable doubt that the error did not change the verdict. 266 Kan. at 920. The same was true in *State v. Murdock*, 286 Kan. 661, 684-85, 187 P.3d 1267 (2008), where the trial court's answer to the jury was an accurate statement of law and did not place undue emphasis on either possible verdict outcome, so the

*Murdock* court found that the error had very little likelihood of changing the verdict.

The jury's questions in this case were completely innocuous. The court responded by accurately stating the law, pointing the jury back to the jury instructions, and reminding the jurors that they must decide the case on the evidence as they remember it only. The questions neither invoked legally significant explanatory answers nor were they of the nature to require Jackson's attorney to consult with him on trial strategy. Jackson's presence in the chambers would not have changed the answers to any of the posed questions. Though it is hard to prove a negative, it is safe to conclude beyond a reasonable doubt that the error of Jackson not being present for the in-chambers discussion about the answers to the jury's questions was harmless.

## WAS THERE SUFFICIENT EVIDENCE TO CONVICT JACKSON OF POSSESSION OF DRUG PARAPHERNALIA?

In his final allegation of error, Jackson contends the State failed to present sufficient evidence to convict him of possession of drug paraphernalia because there was no evidence presented at trial that the scale or baggies found in his residence was used to ingest, inhale, or otherwise introduce a controlled substance into the human body.

### *Standard of Review*

When the sufficiency of evidence is challenged in a criminal case, this court reviews such claims by looking at all the evidence in a light most favorable to the prosecution and determining whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Frye*, 294 Kan. 364, 374-75, 277 P.3d 1091 (2012).

### *Analysis*

Jackson was charged with four counts—two felonies and two counts of drug paraphernalia for the scale and baggies found in his room. Jackson's complaint specifically arises from the wording used in the information. The charges for the baggies and the scale both read in pertinent part as follows:

"Defendant . . . did then and there unlawfully use or possess with the intent to use an item of drug paraphernalia, as defined in K.S.A. 65-4150(c) as amended, scale [baggies], to ingest, inhale, or otherwise introduce a controlled substance . . . into the human body. (Contrary to K.S.A. 2009 Supp. 21-36a09[b][2]) . . . ."

Jackson does not present this claim as an issue of a defective charging document but only as a sufficiency of the evidence issue. The charge as recorded in the information is in fact incomplete. The full statutory language in K.S.A. 2010 Supp. 21-36a09(b)(2) states that it is illegal to use "any drug paraphernalia to *store, contain, conceal*, inject, ingest, [or] inhale . . . a controlled substance into the body." (Emphasis added.) The charging document does not contain those three italicized words; however, Jackson made no argument that this omission limited his right to a fair trial, prejudiced his ability to prepare a defense, or prohibited him from raising the conviction in a subsequent prosecution as would be required in the post-*Hall* analysis of a defective charging document. See *State v. Hall*, 246 Kan. 728, Syl. ¶¶ 11-12, 793 P.2d 737 (1990), *overruled in part on other grounds by Ferguson v. State*, 276 Kan. 428, 78 P.3d 40 (2003). Therefore, this court will not discuss the validity of the charging document.

### Sufficiency of the Evidence

There was ample evidence presented to the jury to support that Jackson was in possession of drug paraphernalia that he intended to use. The scale and the baggies were found in Jackson's bedroom among his personal items. One detective testified that he could smell the odor of burnt marijuana emanating from Jackson's residence when officers entered to execute the search warrant. Another police officer testified that the baggies contained what appeared to be marijuana residue and that baggies were the most common container used to store marijuana. This officer also testified that scales are utilized by drug users to make sure they have received the quantity of drugs for which they paid, and she observed marijuana residue on the scales. Reviewing all the evidence in the light most favorable to the prosecution, a rational factfinder could have found Jackson guilty beyond a reasonable doubt.

Relying only on his sufficiency of the evidence argument, Jackson neither raises any concerns regarding the jury instructions nor alleges jury confusion in his brief. At the end of the trial, the judge went through the jury instructions with both counsel on the record, and neither objected to anything in the two drug paraphernalia instructions. The two jury instructions did not include the "ingest, inhale, or otherwise introduce a controlled substance into the human body" language that Jackson has now put at issue. The jury instructions simply read, in pertinent part, that the State must prove "[t]hat the Defendant intentionally used or possessed with the intent to use drug paraphernalia, specifically: a digital scale [baggies]."

Based on those instructions, the jury had more than enough evidence to convict Jackson of having "used or possessed with the intent to use" the scale and baggies. Any variations or exclusions of the multiple words used in the drug paraphernalia statute to describe "use" in the charging documents was ultimately harmless error.

Affirmed.