NOT DESIGNATED FOR PUBLICATION

No. 126,292

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee,*

v.

LINDSAY NICHOLE SELF,
*Appellant.*

MEMORANDUM OPINION

Appeal from Shawnee District Court; RACHEL L. PICKERING, judge. Submitted without oral argument. Opinion filed December 19, 2025. Affirmed.

*Sam Schirer*, of Kansas Appellate Defender Office, for appellant.

*Jodi Litfin*, deputy district attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before HURST, P.J., GARDNER and BOLTON FLEMING, JJ.

PER CURIAM: Lindsay Nichole Self appeals after being convicted of kidnapping, aggravated burglary, two counts of aggravated robbery, and three counts of aggravated assault arising from a home invasion. Self appeals her convictions and sentence, claiming that the district court erred by admitting the homeowner's in-court identification of her at trial, that insufficient evidence supports Self's conviction for the aggravated robbery of one of the victims, and that the district erred by including Self's prior criminal threat conviction in her criminal history score. Finding no error, we affirm.

1

FACTUAL AND PROCEDURAL BACKGROUND

At around 10 p.m. on February 1, 2022, Daryl Dammann and his wife, Cynthia Dammann, were watching television in the living room of their home in Topeka. They lived with Cynthia's goddaughter (Yvonne Perez), Yvonne's husband (Angel Perez), and their three children. Angel was at work, so he was not in the house at the time, but Yvonne and the children were upstairs.

Cynthia and Daryl heard a knock on the back sliding glass door. This was unusual because guests typically used the front door when visiting. Daryl went to the door and turned on the outside deck light. He saw a person he did not know standing outside and cracked open the door. She was a white woman with brownish hair, wearing a Carhartt-type coat and a white hat with earflaps. She also had a face covering on, but whether she kept it on throughout the ensuing interaction is contested on appeal.

The woman told Daryl that her truck had broken down, so she needed to borrow his phone to call her dad. Daryl retrieved Cynthia's phone to make the call for the woman, who waited outside. When Daryl returned, the woman gave Daryl a phone number. Daryl dialed the number and turned the speakerphone on. The automated operator message for numbers no longer in service played, notifying Daryl that the call could not be completed as dialed.

This alarmed Daryl, so he tried to close the door. At that moment, the woman grabbed the phone from Daryl's hands. Then someone else's arm reached around the bottom of the door with a gun. The gun, a black semiautomatic handgun, was pointed in Daryl's general direction but not directly at him. Daryl moved to the side and tried to push the door closed again, but someone fired a gunshot. No one was hit or injured, but Daryl backed away from the door.

2

The woman and two male accomplices then entered the house, each carrying a gun and wearing black gloves. The men were white or Hispanic and wore black stocking caps, black masks, and dark clothes.

Cynthia screamed, threw her laptop at the door, and ran upstairs. Terrified, she ran into Yvonne's bedroom and yelled that there were robbers with guns in the house. She told Yvonne to get the children and hide in the closet. Once hidden, Cynthia called 911, and police were dispatched to the residence.

Meanwhile, downstairs, the intruders put Daryl in handcuffs and forced him to lie face down on the floor. The woman appeared to be the leader of the group. One of the men pointed a gun at Daryl, and the intruders demanded that he tell them where the money was that he had embezzled from his company. Daryl owned several businesses in Topeka, but he had no idea what the intruders were talking about and told them so. He explained that he kept his money in a bank. One of the men took Daryl's wallet from his back pocket and took his driver's license, a credit card, and around $200 in cash. The intruders also rifled through cabinets and drawers. Eventually, they made Daryl enter a pantry off the kitchen and closed the door.

As the group started to head upstairs, Angel came home from work. On his way into the house, he noticed a truck that he did not recognize in the driveway. This did not alarm him, however, because Daryl frequently had employees or customers at the house, so Angel continued into the house through the garage door.

Daryl got out of the pantry, and Angel saw that he was handcuffed. Seconds later, the woman confronted Angel—she pointed her gun at him and told him to get on the ground. Angel initially refused, but the woman eventually convinced him to lower himself down to his knees. One of the intruders also made Angel slide his phone to them.

While still kneeled, Angel saw one of the men making his way toward the stairs to go upstairs. Angel warned him to stop because there were children up there. After Angel said this, one of the male intruders suddenly said, "Oh shit, we've got to get out of here." Then both male intruders fled through the front door. The woman was on her phone. Angel heard her say something like "just get the mother fucker started and I'll hold them down." Shortly after that, she also ran out of the house.

Angel chased after the woman and saw her running through a nearby field. At that moment, police arrived, and Angel tried to waive them down. Not knowing whether Angel was involved in the home invasion, the officers briefly detained him. The two male intruders escaped in the truck that Angel had seen parked in the driveway and the female intruder escaped separately, on foot.

*Initial Police Investigation*

The officers searched the house and surrounding area. Again, the intruders had taken Daryl's credit card and cash and a handful of other items, including Cynthia's purse. They also took three cellphones—Daryl's phone, Angel's phone, and a home phone. Daryl's credit card was found in the driveway; Angel's cell phone was found in the front yard; and Cynthia's keys were found somewhere else in Topeka. The home phone and Daryl's phone, driver's license, and cash were never recovered. The officers did not locate any shell casings from the incident.

The police collected video recordings from the security cameras posted around the outside of the house. One of the videos showed the woman as she walked across the driveway, wearing camouflage coveralls, a white hat with flaps, and a face covering. Another video showed the woman and two men walking in the driveway. The men wore stocking caps and face coverings.

4

The officers also searched the area around the house for vehicles. They found a Kia Optima parked on the side of the road, not in front of a residence, and still warm. It was snowing at the time, but the car was warm enough that no snow stuck to the hood. The officers ran the plate information and found that the car was registered to Self.

Early the next morning, officers drove to Self's house and knocked on her door, but no one answered. Later that morning, Self called the police to report her car stolen. When Deputy James Landry drove to Self's house to discuss the matter, Self told Landry that her spare keys were missing and she believed that was how her car had been taken. She claimed she had stayed home the night before, and explained that she lived with Bret Traphagan, who was also home. After taking a theft report, Landry arrested Self and took her to the Sheriff's Office for an interview.

Following Self's arrest, police searched her home. The officers found a pair of camouflage overalls hanging on a coat rack, a facial covering in the laundry room, and a pair of gloves in the living room. Officers did not find a white hat with earflaps, guns, or any of the stolen property.

Detective John Culver conducted Self's interview. The interview lasted around four or five hours. Culver showed Self a video from the Dammann's surveillance footage and told her that he believed that she was the woman in the video. He also told Self that he had 20 similar videos of her. This was untrue—a "tactical deception." Self looked away after watching the video and seemed to get emotional. She denied any involvement and suggested that the woman in the video was Sara O'Neal. She also maintained throughout the interview that her car had been stolen.

By the end of the interview, Self was angry and eventually became physically aggressive. She was taken to jail. Her boots and glasses were seized as evidence because

5

they were similar to those worn by the woman in the surveillance video. Officers also seized Self's cell phone.

Culver then interviewed Traphagan. Traphagan explained that he had a daughter with Self, and they all lived together. The night of the home invasion, he had a few beers and watched a basketball game before going to bed at around 9:30 p.m. Traphagan usually slept on the couch, but their daughter was gone that night, so he slept in her room. When Traphagan went to bed, he assumed that Self was home. Self's bedroom was next to their daughter's room, and Traphagan never saw Self go in or out, nor did he see her the next morning when he left for work around 6:30 a.m.

*Cellphone Investigation and Jail Call Evidence*

During the interview with Culver, Self gave consent to another detective, Ryan Myers, to look through her phone for location data. Myers looked through the phone but could not find any location data. Later, Patrick Ladd performed a cell phone extraction on Self's phone, but he extracted little to no user data because the phone was locked by a personal identification number.

While in jail, Self called her friend, Jennifer Cortez. Self gave Cortez her Facebook account information and password and asked her to delete anything incriminating. Self then said, "Wait, I think I already did that."

*Pretrial Proceedings*

At the preliminary hearing, Daryl, Cynthia, and Angel recounted the events that occurred during the home invasion and described the general characteristics of the intruders. Law enforcement had not asked Daryl to identify any of the perpetrators before the hearing, including the woman involved. Nor did the State ask Daryl to identify the

6

woman during the hearing. Daryl testified but did not hear the other witnesses' testimonies. But after the hearing, Daryl approached the prosecutor and identified Self as the female intruder.

Self filed a pretrial motion to suppress evidence of Daryl's identification. At an evidentiary hearing on the motion, Daryl testified that he had recognized Self as the female intruder when he saw her at the preliminary hearing, with 98 to 100 percent certainty. He had first learned of Self's arrest from a news report, in which he had seen a picture of Self. But he did not tell law enforcement at that time that he recognized Self as the assailant. He also admitted that during the evening of the home invasion, he had consumed around three 16-ounce beers, but he maintained that this did not make him unable to perceive or see what happened.

In a written order, the district court denied Self's motion to suppress. The district court applied the two-step test for assessing the reliability of eyewitness identifications outlined in *State v. Corbett*, 281 Kan. 294, 304, 130 P.3d 1179 (2006). "First, the court determines whether the procedure used for making the identification was impermissibly suggestive. If so, the second step requires an analysis of whether the impermissibly suggestive procedure led to a substantial likelihood of misidentification." 281 Kan. at 304.

Under the first step, the district court found the identification procedure that led to Daryl's identification was not unnecessarily suggestive.

> "This court finds that the identification procedure was not unnecessar[ily] suggestive. At the preliminary hearing, the eyewitness was not pressured to identify Ms. Self, nor did the State make additional statements to Mr. Dammann at the hearing to coax or persuade him into stating that Ms. Self was the woman who was involved in the home invasion. Further, this court had sequestered the witnesses at preliminary hearing. Mr. Dammann never heard the other witnesses' testimony. Following his testimony, and

without hearing the testimony of the other witnesses, Mr. Dammann would have not known if Ms. Self had been identified by the other witnesses. It was only after the preliminary hearing that Mr. Dammann stated that Ms. Self was the woman whom he had spoken to, and entered hi[s] home without any authority."

Given this, the district court found it unnecessary to reach the second step of the test. The district court concluded that because the identification procedure was not unnecessarily suggestive, no "substantial likelihood of misidentification [would render] the identification unreliable."

*Identification and Other Evidence Presented at Trial*

Over counsel's objection, Daryl identified Self as the offender in court for the first time at trial. Cynthia and Angel described the offender's appearance but did not identify Self specifically.

Daryl explained to the jury that he had first identified Self right after the preliminary hearing. By that time, he had already seen a picture of Self on a news website alongside a report of her arrest. He had not said to law enforcement immediately after the home invasion that he would be able to identify the female intruder from a lineup. And investigating officers had never asked him to participate in a lineup identification. He admitted that he had consumed three 16-ounce beers the night of the incident.

Midtrial, defense counsel asked Ladd to try another extraction on Self's cellphone because new software had been released. Defense counsel sought information on Self's location data during the home invasion. Ladd performed the extraction and reported that the extraction still failed to find any location data. But Ladd was able to recover Self's search history, which the State presented to the jury. According to Self's browser history, Self had made several inquiries about Daryl's personal and professional life, including his

business activities and home address. Self had also researched "embezzlement" on a legal website. And she had conducted these searches during the weeks preceding the home invasion.

*Defense Witnesses*

Cortez and Traphagan testified in Self's defense. Cortez testified that the conversation about Self's Facebook during the jail call was not in reference to this case. Instead, Cortez claimed that Self wanted her to make sure that Self's on-again-off-again boyfriend did not gain access to her Facebook account. Cortez also testified that this boyfriend had access to a lot of Self's things, including her car. Traphagan explained that he did not see Self the night of the incident, but he assumed that she was home. If Self had left in the middle of the night, he would have been awakened by Self's dog—a large bulldog.

Self also called Dorreen Fiegener, to whom Self provided caregiving services through an agency. Fiegener testified that Self had texted her the morning of February 2, notifying her that Self's car had been stolen. A message recovered from Self's phone corroborated this testimony.

*Verdict and Sentencing*

After a lengthy deliberation of over eight hours, the jury convicted Self as charged, finding her guilty of kidnapping, aggravated burglary, two counts of aggravated robbery, and three counts of aggravated assault.

Before sentencing, Self objected to her criminal history score's inclusion of a 2013 conviction for criminal threat. The presentence investigation report indicated that Self's criminal history score was B. But without the criminal threat conviction, Self's score

would have been C. Self argued that her conviction could not be included because the Kansas Supreme Court had deemed the criminal threat statute unconstitutional. Self admitted that in her 2013 case, the State's amended complaint described the crime charged as intentional criminal threat. Still, she claimed that criminal threat had not been initially charged in that case, and the State had filed the amended complaint after she signed the plea agreement. She thus claimed that it was unclear whether she saw the amended complaint before entering her plea and argued that the State had the burden to prove which portion of the criminal threat statute her conviction was under.

The State responded that the 2013 amended complaint showed that Self was convicted of an intentional criminal threat, and that because only the reckless portion of the criminal threat statute had been found unconstitutional, Self's 2013 conviction was properly included in her criminal score. The State attached copies of the amended complaint in the 2013 criminal threat case and the parties' written plea agreement as support.

At sentencing, the parties presented additional arguments. The district court found the 2013 conviction was for intentional criminal threat and was thus properly included in Self's score. And finding Self's criminal history score a B, the district court sentenced Self to 316 months imprisonment.

Self timely appeals.

ANALYSIS

*Did the district court err by admitting Daryl's first-time, in-court witness identification of Self at trial?*

Self first argues that Daryl's identification of her at trial as the female intruder was prejudicial, unreliable, and should have been excluded as a matter of due process. She notes that Daryl first identified her after the preliminary hearing, when the prosecutor and district court had already implicated her as a "probable participant" in the crimes. She asserts that the failure to exclude his identification from trial resulted in a due process violation, entitling her to a new trial.

The State counters that the identification procedure was not unnecessarily suggestive and even if suggestive, Daryl's identification was still reliable. The State adds that even if Daryl's identification was erroneously admitted, the error was harmless because other evidence showed Self committed the offenses and the district court gave the jury a correct cautionary instruction on eyewitness identification.

*Standard of Review*

An appellate court reviews "'a challenge to an eyewitness identification as a due process determination involving a mixed question of law and fact.' *State v. Cruz*, 297 Kan. 1048, 1058, 307 P.3d 199 (2013)." *State v. Thurber*, 308 Kan. 140, 196, 420 P.3d 389 (2018). We review the record to determine whether substantial competent evidence supports the district court's factual findings. We review the district court's ultimate legal conclusion drawn from those findings de novo. A district court's lack of factual findings does not alter this court's standard of review. 308 Kan. at 196.

*Applicability of Screening Test for Admissibility of In-Court Identifications*

Although Daryl first identified the defendant by volunteering his identification of her after the preliminary hearing, and Self first challenged that identification before trial in a motion to suppress, Self has not styled her appeal as challenging the denial of her motion to suppress the pretrial identification. Instead, she frames her legal argument as a challenge to Daryl's first-time in-court identification of her as the person who committed the home invasion.

Generally, the district court must follow a two-step test to determine whether an eyewitness identification is admissible. The court must first determine "whether the police procedure used to obtain the original out-of-court identification was unnecessarily suggestive." Cruz, 297 Kan. 1048, Syl. ¶ 2. If so, the second consideration is "whether there was a substantial likelihood of misidentification under the totality of the circumstances." 297 Kan. 1048, Syl. ¶ 2. "This rule typically applies to decide the admissibility of eyewitness identifications following out-of-court identifications." *Thurber*, 308 Kan. at 196.

But this test may not typically apply when determining the admissibility of an eyewitness' in-court identification. The *Thurber* court reviewed a claim challenging the admissibility of a first time, in-court identification, yet declined to decide the issue. Instead, the court assumed error and reviewed the admission of the in-court identification for harmless error only, likely because that is the sole argument the State relied on. *Thurber*, 308 Kan. at 196-97.

Our Supreme Court has not yet resolved this issue. As *Thurber* noted, other jurisdictions are split on the question of whether in-court identifications require due process screening. 308 Kan. at 196-97. Compare *State v. Dickson*, 322 Conn. 410, 426, 141 A.3d 810 (2016) (first time in-court identifications implicate due process protections

12

and must be prescreened by trial court), *with Byrd v. State*, 25 A.3d 761, 767 (Del. 2011) (inherent suggestiveness in normal trial procedure does not implicate due process with respect to initial in-court identifications). At least one panel of this court has "compared a first time, in-court identification to a one-person show-up and concluded the procedure was unnecessarily suggestive." *Thurber*, 308 Kan. at 196-97 (discussing *State v. Jenkins*, No. 104,671, 2012 WL 1450439, at *7-8 [Kan. App. 2012] [unpublished opinion]). The *Jenkins* panel, however, then applied the reliability factors under the second step of the test and determined the in-court identification was independently reliable to allow its admission at trial. *Jenkins*, 2012 WL 1450439, at *8.

*Suggestiveness of the Procedure*

Self asks this court to adopt the reasoning in *Dickson* and find the typical in-court identification "a byproduct of circumstances arranged by state actors" and thus inherently unnecessarily suggestive. In opposition, the State notes that *Dickson* is an outlier because most state courts have refused to find in-court identifications inherently suggestive.

Self asks us to extend the rule from *Perry v. New Hampshire*, 565 U.S. 228, 132 S. Ct. 716, 181 L. Ed. 2d 694 (2012) by holding that district courts must prescreen all in-court identifications. *Perry* held "that the Due Process Clause does not require a preliminary judicial inquiry into the reliability of an eyewitness identification when the identification was not procured under unnecessarily suggestive circumstances arranged by law enforcement." 565 U.S. at 248. Self asks us to follow *Dickson*, which held that "first time in-court identifications, like in-court identifications that are tainted by an unduly suggestive out-of-court identification, implicate due process protections and must be prescreened by the trial court." 322 Conn. at 427.

The State relies on contrary rulings and asks us to follow the majority of state courts that have rejected this argument. See, e.g., *Walker v. Commonwealth*, 302 Va. 304,

13

887 S.E.2d 544 (2023) (The Due Process Clause does not require a court to conduct a pre-screening of an eyewitness' testimony before that witness is permitted to identify the defendant for the first time in court.); *State v. Doolin*, 942 N.W.2d 500, 511-12 (Iowa 2020) (rejecting a challenge to the admission of a first-time in-court eyewitness identification as impermissibly suggestive); *Garner v. People*, 436 P.3d 1107, 1118 (Colo. 2019) (noting that only "[a] small minority of courts have applied [the due process analysis of eyewitness identification set forth in *Neil v.*] *Biggers*[, 409 U.S. 188, 93 S. Ct. 375, 34 L. Ed. 2d. 2d 401 (1972)] to first-time in-court identifications since *Perry* was decided"); *Fairley v. Commonwealth*, 527 S.W.3d 792, 799-800 (Ky. 2017) (expressly declining to extend *Biggers* to in-court identifications when no unduly suggestive pretrial behavior has been alleged); *State v. King*, 156 N.H. 371, 373-76, 934 A.2d 556 (2007) (factfinder can observe witness during in-court identification process and evaluate the reliability of the identification); *State v. Lewis*, 363 S.C. 37, 42-43, 609 S.E.2d 515 (2005) (remedy for alleged suggestiveness is cross-examination and argument). See also *United States v. Thomas*, 849 F.3d 906, 911 (10th Cir. 2017) ("[E]videntiary reliability is traditionally a question for the jury, not the judge, and . . . other due-process protections are in place that limit the weight the jury attributes to evidence that may be unreliable. . . . Mr. Thomas was able to confront the witness during cross-examination with the assistance of competent counsel. . . . [Ultimately,] [w]hether to credit the in-court identification was the province of the jury.") (citing *Perry*, 565 U.S. at 245-46).

To the extent Self asks us to rule that first-time, in-court identifications are unduly suggestive as a matter of law, we disagree, finding the analysis persuasive in the line of cases to the contrary. We thus decline Self's invitation to find that all first-time, in-court identifications derive from inherently suggestive procedures.

Here, the district court applied the two-step test before admitting Daryl's out-of-court identification. To the extent that Self asserts that the district court's conclusion under the first prong of the eyewitness identification test is wrong, we again disagree.

14

The district court made the following findings supporting its conclusion that the out-of-court identification procedure was not unnecessarily suggestive:

"At the preliminary hearing, the eyewitness was not pressured to identify Ms. Self, nor did the State make additional statements to Mr. Dammann at the hearing to coax or persuade him into stating that Ms. Self was the woman who was involved in the home invasion. Further, this court had sequestered the witnesses at preliminary hearing. Mr. Dammann never heard the other witnesses' testimony. Following his testimony, and without hearing the testimony of the other witnesses, Mr. Dammann would have not known if Ms. Self had been identified by the other witnesses. It was only after the preliminary hearing that Mr. Dammann stated that Ms. Self was the woman whom he had spoken to, and entered hi[s] home without any authority."

Self does not challenge these findings, so she fails to allege any error. We have reviewed the record and find substantial competent evidence supporting the district court's findings. The facts, correctly stated in the district court's analysis above, show no involvement by police in Daryl's identification of Self right after the preliminary hearing. The district court reasonably concluded from these facts that Daryl's identification was admissible at trial.

*Likelihood of Misidentification*

Self also contends that the district court erred by not considering the second part of the two-step test—whether the procedure led to a substantial likelihood of misidentification. But only if the court finds the procedure unnecessarily suggestive does the court need to consider whether the unnecessarily suggestive procedure led to a substantial likelihood of misidentification. See *Cruz*, 281 Kan. at 304.

Self asserts that Daryl's unnecessarily suggestive identification was unreliable because he had consumed three beers the evening of the invasion, it was nighttime and

15

thus dark outside, and the identification was arguably made spontaneously yet after he had seen her photo in an article linking her to the crime.

Notable factors that should be considered in making such a determination include:

(1) the witness' opportunity to see and observe the defendant at the time of the crime;

(2) the witness' degree of attention;

(3) the accuracy of the witness' prior description of the defendant;

(4) the level of certainty shown by the witness;

(5) the length of time between the crime and the identification;

(6) the witness' capacity to observe the event, including his or her mental or physical abilities;

(7) the spontaneity and consistency of the witness' identification and the susceptibility to suggestion; and,

(8) the nature of the event being observed and the likelihood that the witness would perceive, remember, and relate it accurately.

*Corbett*, 281 Kan. at 304-05.

But even if we assume that first time, in-court identifications are inherently unnecessarily suggestive, as Self contends, and reach this second part of the test, this court is not appropriately situated to decide it. The district court did not consider the *Corbett* reliability factors on the record, thus we lack the ability to review and evaluate those factors. And although many facts are undisputed, the parties dispute at least one important fact relevant to this analysis—whether Daryl saw the female intruder without a mask on, and if so, for how long. We are not a fact-finding court. "Fact-finding is simply not the role of appellate courts." *State v. Gutierrez-Fuentes*, 315 Kan 341, 347, 508 P.3d

16

378 (2022). We thus decline to consider whether the identification procedure led to a substantial likelihood of misidentification.

*Harmless Error*

We will, however, reach the harmless error issue, in the event we have erred in our analysis above. This court's harmless error analysis is de novo. When an error infringes on a constitutional right, the error may be declared harmless only when the benefitting party proves beyond a reasonable doubt it did not affect the trial's outcome in light of the entire record, i.e., when there is no reasonable possibility the error contributed to the verdict. *Thurber*, 308 Kan. at 196; *State v. Ward*, 292 Kan. 541, 569, 256 P.3d 801 (2011) (citing *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 [1967]).

Because the alleged error implicates Self's constitutional right to due process, we apply the constitutional harmless error test. So this court must be convinced beyond a reasonable doubt the error did not affect the trial's outcome. *Thurber*, 308 Kan. at 196.

Self emphasizes that the State did not present forensic evidence tying her to the crimes and any evidence suggesting her involvement was merely circumstantial. She thus contends that the evidence of her involvement in the home invasion was not overwhelming, so the jury likely gave significant weight to Daryl's identification in reaching its verdict.

The State counters that the following evidence independently showed beyond a reasonable doubt that Self was the female intruder in Daryl's home:

- Law enforcement found Self's car just north of the Damman's house, parked on the side of the road but not in front of a residence and still warm.

- Nothing other than Self's report indicated that her car was stolen.

- Police found clothing in Self's apartment like the clothes worn by the female intruder shown in the security videos.

- During her interview with Culver, Self wore boots and glasses that looked like those the female intruder wore.

- Daryl and Angel described the woman's hair as medium length and "dirty brownish" or "blondish." Cynthia, a cosmetologist, testified that Self had "medium light blonde hair with heavy highlights."

- The jury watched the surveillance video of Self approaching the house and the video of her interview with Culver to compare the clothing, boots, glasses, hair, and other features.

- Law enforcement discovered an extensive search history for Daryl's name, address, and businesses on Self's phone. These searches took place a few weeks before the crimes were committed. The web search history also included a search for "Embezzlement FindLaw." This coincided with Daryl's testimony that the intruders asked him about embezzled money.

- Self called Cortez from jail to ask her to delete anything incriminating from her Facebook account.

Although one may or may not characterize this evidence as overwhelming, it is at least significant and collectively convincing. This independent evidence connects Self to the crimes and carries as much or more weight than Daryl's identification based on his recollection of a traumatic home invasion during which the offenders wore masks.

And as the State shows, the district court gave the jury the pattern cautionary instruction for considering eyewitness identifications. See PIK Crim. 4th 51.110 (2022

18

Supp.). That instruction correctly listed six reliability factors for the jury to consider. It also explained: "The law places the burden upon the State to identify the defendant. The law does not require the defendant to prove she was wrongly identified." PIK Crim. 4th 51.110. This instruction indicated to the jury that the eyewitness identification required considerable scrutiny. Cf. *State v. Shields*, 315 Kan. 814, 819, 511 P.3d 931 (2022) (finding "properly worded cautionary instruction alleviates some of that concern" created by the introduction of potentially unreliable eyewitness identifications).

Additionally, defense counsel cross-examined Daryl, questioning the accuracy of his identification. Defense counsel also emphasized to the jury the importance of considering the factors listed in the cautionary instruction. And during closing arguments, defense counsel addressed each factor and argued that they showed Daryl's identification was unreliable.

Given this record, even if the court erred by admitting Daryl's witness identification of Self at trial, we are convinced beyond a reasonable doubt that the jury would have returned a guilty verdict even without Daryl's in-court identification of the defendant.

*Does sufficient evidence support Self's conviction for the aggravated robbery of Angel?*

Self next challenges the sufficiency of the evidence supporting one of her two aggravated robbery convictions. She claims that although she may have taken Angel's phone *in* his presence, she did not take it *from* his person or presence as the relevant statute requires. The facts show that one of the intruders had made Angel, who was on his knees, slide his phone across the floor to them. The intruder later dropped that phone in the front yard from where it was recovered.

*Standard of Review and Basic Legal Principles*

When a defendant challenges the sufficiency of the evidence to support a criminal conviction, "we review the evidence in a light most favorable to the State to determine whether a rational fact-finder could have found the defendant guilty beyond a reasonable doubt. We do not reweigh evidence, resolve conflicts in the evidence, or pass on the credibility of witnesses." *State v. Mendez*, 319 Kan. 718, 723, 559 P.3d 792 (2024). This standard requires us to affirm a conviction on sufficiency grounds when some evidence in the record supports each element of the offense. See *State v. Parker*, 309 Kan. 1, 13, 430 P.3d 975 (2018) ("To meet the sufficiency standard, evidence must support each element of a crime.")."It is only in rare cases where the testimony is so incredible that no reasonable fact-finder could find guilt beyond a reasonable doubt that a guilty verdict will be reversed." *State v. Zeiner*, 316 Kan. 346, 350, 515 P.3d 736 (2022).

*The Evidence Supports Self's Conviction for Aggravated Robbery of Angel*

The jury convicted Self of aggravated robbery under K.S.A. 2021 Supp. 21-5420(b)(1)-(2). That provision requires proof that Self committed a robbery while "armed with a deadly weapon" or inflicting "bodily harm." K.S.A. 21-5420(b)(1)-(2). Self does not allege that the evidence fails to show one of those aggravating circumstances, tacitly conceding that the offense was committed with a gun.

Self instead argues that no robbery was proven. Robbery is defined under K.S.A. 21-5420(a) as "knowingly taking property from the person or presence of another by force or by threat of bodily harm to any person." As this court has explained, "[t]he use of 'person or presence' describes the victim's proximity to the property taken." *State v. Jackson*, 49 Kan. App. 2d 116, 135, 305 P.3d 685 (2013). See 49 Kan. App. 2d at 136 (finding no alternative means issue presented by phrase "person or presence" and

20

affirming conviction where evidence showed property taken from victim's presence). Self's argument related to this provision is twofold.

First, Self argues that she did not take the phone from Angel's person, citing *State v. Robinson*, 27 Kan. App. 2d 724, 8 P.3d 51 (2000). In *Robinson*, this court held that a taking "from the person" of a victim requires proof that the victim had direct contact with the item when stolen. 27 Kan. App. 2d at 728. Because Self took Angel's phone by having him slide the phone across the floor to her, she may not have taken it from his person. We assume she did not take the phone from his person.

We thus focus on whether Self took the phone from Angel's presence. Self argues that she took Angel's phone *in* his presence but not *from* his presence, as the statute requires. She notes that an earlier version of the statute criminalized the taking of property "in" a victim's presence, yet she admits that this "is a fine distinction in statutory phrasing." But we find this change immaterial—this court has found that the Legislature effected no change in the law by changing this language. See *Robinson*, 27 Kan. App. 2d at 727 (finding nothing in legislative history or later cases to show that the change in preposition for which "presence" is the object—switching "in" to "from"—was meant to effect any substantive change in law). We agree with *Robinson*.

Still, Self argues that there is a difference, and because "the female intruder did not succeed in taking Angel's cellphone very far," the jury could not have reasonably found that she took the phone *from* his presence. Self asks us to rule that the term "presence" as used in K.S.A. 21-5420(a) suggests that stolen property must be taken a certain distance from the victim, citing *State v. Glymph*, 222 Kan. 73, 75, 563 P.2d 422 (1977). In *Glymph*, our Supreme Court found that property may be taken from the presence of a victim even if the victim was not in the "immediate vicinity" when the taking occurred. 222 Kan. at 75. The victim in that case was confined in a shed, a fenced yard away, when

21

the defendant participated in a heist of his gas station. Despite the distance between the victim and the taking, *Glymph* found sufficient evidence of a robbery. 222 Kan. at 73-75.

Self argues that given the reasoning for *Glymph*'s holding, it logically follows that Angel, who was in the house, was still within the presence of his cellphone whether it was in the house or the yard, so the phone was never actually taken from his presence, as the statute requires.

But we are unpersuaded. True, Angel's phone was dropped in the front yard. Yet the statute does not require proof that stolen property travel a certain distance to prove robbery. See K.S.A. 21-5420(a). The jury heard the evidence that Self challenges and it determined that she had taken the phone from Angel's presence. It is not within this court's purview to reweigh evidence or resolve conflicts in the evidence. *Mendez*, 319 Kan. 723. Self's argument essentially asks this court to read language into the robbery statute, as the statute does not require proof that Self kept the phone for a specific amount of time or took it a certain distance away from Angel. When Self took Angel's phone while she was in his presence, armed with a gun, the offense of aggravated robbery was complete. See K.S.A. 21-5420(a). What she did with the phone later is immaterial.

Viewing the evidence in the light most favorable to the State, we find sufficient evidence of Self's aggravated robbery of Angel. See K.S.A. 21-5420(b)(1)-(2). We thus affirm that conviction.

*Did the district err by including Self's prior criminal threat conviction in her criminal history score?*

Finally, Self contends the district court illegally sentenced her by using an improper criminal history score, which the district court found was B. Self asks us to

22

vacate her sentence and remand to the district court with directions to resentence her using the correct criminal history score of D.

Self contends that under K.S.A. 21-6810(d)(9), a conviction based on a statute that has been found unconstitutional by an appellate court cannot be used for criminal history scoring, citing *State v. Boettger*, 310 Kan. 800, 822-23, 450 P.3d 805 (2019). In *Boettger*, the Kansas Supreme Court held that the part of K.S.A. 2018 Supp. 21-5415(a)(1) that defined the crime of reckless criminal threat was unconstitutionally overbroad because it punishes conduct that is constitutionally protected under some circumstances, overruling this court's contrary finding in *State v. Boettger*, No. 115,387, 2017 WL 2709790, at *1 (Kan. App. 2017) (unpublished opinion). 310 Kan. at 822-23. Self was convicted under K.S.A. 21-5415(a) as well. Under *Boettger*, if a criminal threat conviction was based on a reckless mental state, that conviction cannot be counted in a defendant's criminal history because that part of the statute is unconstitutionally overbroad.

In response, the State argues that Self's criminal threat conviction was properly included in her criminal history score because Self was charged solely with intentional threat. It also argues that *Counterman v. Colorado*, 600 U.S. 66, 143 S. Ct. 2106, 216 L. Ed. 2d 775 (2023), effectively overruled *Boettger* and allowed convictions for reckless threats. *Counterman* held that the First Amendment requires proof of a defendant's subjective understanding of the threatening nature of a statement to be punished as a crime, but a mental state of recklessness is sufficient to establish a true threat. 600 U.S. at 69. And we are duty bound to follow controlling United States Supreme Court precedent. See *State v. Davidson*, 314 Kan. 88, 91, 495 P.3d 9 (2021); *State v. Kornelson*, 311 Kan. 711, 715, 466 P.3d 892 (2020); *State v. Lawson*, 296 Kan. 1084, Syl. ¶ 1, 297 P.3d 1164 (2013) ("The United States Supreme Court's interpretation of the United States Constitution is controlling upon and must be followed by state courts.").

23

The State also relies on the finding by a panel of this court in *Phipps,* which held that *Counterman* overruled the relevant holding in *Boettger*. See *State v. Phipps*, 63 Kan. App. 2d 698, Syl. ¶ 1, 539 P.3d 227 (2023) (finding no error in using reckless criminal threat conviction to calculate criminal history score because *Counterman* overruled *Boettger*). But before the parties filed their appellate briefs, our Supreme Court granted review of *Phipps*, so our panel's decision in *Phipps* had no force or effect thereafter. See Supreme Court Rule 8.03(k)(2) (2025 Kan. S. Ct. R. at 61) ("If a petition for review is granted, the Court of Appeals decision has no force or effect."). Our Supreme Court then dismissed *Phipps* as moot because Phipps had completed his sentence. *State v. Phipps*, 320 Kan. 616, 624, 570 P.3d 1240 (2025), *reh. granted* October 17, 2025. And the Kansas Supreme Court recently granted motions for rehearing and modification by both parties to its *Phipps* case, so we do not rely on *Phipps* here.

*Standard of Review*

Whether a sentence is illegal is a question of law over which appellate courts have unlimited review. *State v. Mitchell*, 315 Kan. 156, 158, 505 P.3d 739 (2022). An illegal sentence may be corrected at any time while the defendant is serving the sentence. See K.S.A. 22-3504(a); *State v. Hambright*, 310 Kan. 408, 411, 447 P.3d 972 (2019). Because Self raised this issue before sentencing, the State bore the burden of proving that her prior crime arose under the intentional portion of the criminal threat statute that had not been previously declared unconstitutional. K.S.A. 21-6814(c).

*Whether Counterman effectively overruled Boettger is irrelevant to this criminal history score.*

Self was convicted of criminal threat in 2013 under K.S.A. 21-5415(a)(1). That crime may be committed intentionally or recklessly:

24

"A criminal threat is any threat to: . . . Commit violence communicated with intent to place another in fear, or to cause the evacuation, lock down or disruption in regular, ongoing activities of any building, place of assembly or facility of transportation, or in reckless disregard of the risk of causing such fear or evacuation, lock down or disruption in regular, ongoing activities." K.S.A. 2013 Supp. 21-5415(a)(1).

Self argues that under the holding in *Boettger* and K.S.A. 21-6810(d)(9), her sentence must be reversed and corrected due to the erroneous inclusion of her criminal threat conviction.

But after the parties filed their briefs, the Kansas Supreme Court decided *State v. Smith*, 320 Kan. 62, 562 P.3d 697 (2025), which resolves the issue before us. Both parties filed Rule 6.09 letters addressing *Smith*. The Kansas Supreme Court's decision in *Smith*, 320 Kan. at 90-91, interpreted and applied K.S.A. 21-6810(d)(9). That statute provides that "'[p]rior convictions of a crime defined by a statute that has since been determined unconstitutional by an appellate court shall not be used for criminal history scoring purposes.'" 320 Kan. at 90. The *Smith* court held:

"If a prior conviction arose under a statute 'that has since been determined unconstitutional by an appellate court,' it cannot be counted in a criminal history score. Nothing in the plain language of the statute qualifies this limitation by considering *subsequent repudiations* of an appellate court's holding that a statute is unconstitutional." 320 Kan. 91.

The *Smith* court found the impact of *Counterman* on *Boettger* irrelevant because *Boettger* had held a portion of the Kansas Statute unconstitutional: "And while the parties argue at length as to whether *Counterman* . . . effectively overruled *Boettger*, this consideration is irrelevant under the plain language of K.S.A. 21-6810(d)(9), which asks *only* whether an appellate court 'has since' ruled the statute unconstitutional—not whether that holding remains good law." *Smith*, 320 Kan. at 91. Because the Kansas Supreme

25

Court ruled the reckless portion of the criminal history statute unconstitutional in *Boettger*, "it cannot be counted in a criminal history score," even if *Counterman* had effectively overruled *Boettger*. 320 Kan. 91; K.S.A. 21-6810(d)(9).

So under *Smith* and K.S.A. 21-6810(d)(9), if the prior conviction arose under the "intentional" clause of the statute that remained constitutional after *Boettger*, then it is properly included in the offender's criminal history. But if the prior conviction arose under the "reckless" portion of the statute, then it must be excluded from the offender's criminal history.

*The intentional criminal threat portion of K.S.A. 21-5415(a)(1) remains constitutional after* Boettger *and* Smith*.*

Self argues that *Boettger* precludes the district court from including criminal threat convictions based on not only reckless but also intentional threats. She relies on K.S.A. 21-6810(d)(9), which provides that "[p]rior convictions of a crime defined by a statute that has since been determined unconstitutional by an appellate court shall not be used for criminal history scoring purposes." Self contends, using the plain language analysis, that the criminal threat statute, K.S.A. 21-5415(a)(1), which encompasses both reckless and intentional threats, has "been determined unconstitutional" by an appellate court—the Kansas Supreme Court in *Boettger*—so no part of that statute shall be used for criminal history scoring purposes. Self thus concludes that even an intentional criminal threat conviction is unconstitutional under *Smith* and K.S.A. 21-6810(d)(9).

We disagree. That is a broad brush reading of K.S.A. 21-6810(d)(9) which has been refuted by *Boettger*, *Johnson*, and *Smith*. *Boettger* held only the reckless criminal threat portion of the statute unconstitutional. 310 Kan. at 822-23. And our Supreme Court has consistently characterized *Boettger*'s holding that way. See *Smith*, 320 Kan. at 91 ("*Boettger*, 310 Kan. at 822, held that *the portion* of K.S.A. 2018 Supp. 21-5415

26

criminalizing reckless criminal threat is unconstitutional. . . . Because the State failed to carry its evidentiary burden that Smith's 2003 conviction arose under *a portion of the statute* that remained constitutional after *Boettger*, the district court erred in including Smith's 2003 conviction in his criminal history score." [Emphases added.]). *Boettger* held that "the reckless disregard provision encompasses more than true threats and thus potentially punishes constitutionally protected speech. The reckless disregard provision is thus overbroad and unconstitutional." *State v. Johnson*, 310 Kan. 835, 842, 450 P.3d 790 (2019).

Because nothing in relevant precedent either finds the intentional criminal threat portion of K.S.A. 21-5415(a)(1) unconstitutional, or includes any rationale for so finding, the intentional portion of the criminal threat statute remains constitutional after *Boettger*'s ruling. See *Smith*, 320 Kan. at 91; *Boettger*, 310 Kan. at 822-83. The intentional criminal threat portion of K.S.A. 21-5415(a)(1) is thus not impacted by K.S.A. 21-6810(d)(9).

*The State met its burden to prove intentional criminal threat.*

Self also contends that the State failed to meet its burden to prove that her prior crime was based on an intentional criminal threat instead of a reckless criminal threat. As noted above, because Self raised this issue before sentencing, "the State bore the burden of proving that [her] conviction arose under the portion of the statute that had not been previously declared unconstitutional." *Smith*, 320 Kan. at 91; see K.S.A. 21-6814(c). The district court correctly held the State to its burden at sentencing to prove Self's criminal history by a preponderance of the evidence. "Preponderance of the evidence" is defined as "'evidence which is of greater weight or more convincing than the evidence which is offered in opposition to it.'" *In re B.D.-Y.*, 286 Kan. 686, 691, 187 P.3d 594 (2008).

To meet its burden at the district court, the State submitted copies of Self's 2013 plea agreement and the corresponding amended complaint. We thus review those

documents. The amended complaint lists K.S.A. 21-5415(a) as the relevant statutory provision and charged Self solely "with the intent" to make a criminal threat:

> "On or about the 2nd day of April, 2013 in the State of Kansas and County of Shawnee, LINDSAY NICOLE SELF, did, then and there, unlawfully, feloniously, and knowingly, communicate a threat to commit violence, with the intent to place another in fear, to-wit: John Robert Palmer, contrary to the form of the statutes in such case made and provided and against the peace and dignity of the State of Kansas."

This mirrors the language of the criminal threat statute but includes only the language related to intentional criminal threat. So in preparing the amended complaint, the prosecutor deliberately excised from the statute the problematic language relating to reckless disregard. See K.S.A. 2013 Supp. 21-5415(a)(1). That is the only language that *Boettger* found unconstitutional. Because of the narrowed language in the amended complaint, the district court appropriately found the charged offense was solely for intentional criminal threat.

Self acknowledges that the amended complaint charges her only with intentional criminal threat. Still, Self contends that the amended complaint was not filed until the day after she entered her plea, suggesting that she did not plead to intentional criminal threat. Yet the record does not show what the original complaint charged, or what change was made by the amended complaint. Self also concedes that the district court judge initialed and dated the amended complaint on the date of her plea. Her application to modify her plea to guilty also shows the judge's initials and bears the date of her plea hearing, one day before the documents were filed. Given those facts, it is a reasonable inference that the judge had and used a copy of the amended complaint during the plea hearing and that Self pleaded guilty to the only offense listed in it—intentional criminal threat. So even if the amended complaint changed the charged crime to intentional (from reckless, or from reckless or intentional in the alternative), Self fails to show that it is more likely than not that she pleaded to something other than intentional criminal threat.

The district court also reviewed Self's 2013 plea agreement. It sheds no light on whether her criminal threat was made recklessly or intentionally. But its "Factual Basis" shows that Self agreed as follows:

> "I declare that I am fully and completely aware of the evidence that the State has against me in this case. I have read or have had read to me the charging affidavit filed in support of the Complaint in this case. Further, I have either read the law enforcement reports or have had detailed discussions with my attorney concerning the facts alleged by the State in support of the charges they have filed against me. I acknowledge that if this case were to go to trial the State of Kansas would be able to establish sufficient facts to enable a reasonable juror to find me guilty beyond a reasonable doubt of those charges to which I am pleading guilty herein."

Self argues that this fails to adequately show that she admitted all the elements of the charged offense, as required. See *State v. Bey*, 270 Kan. 544, 546, 17 P.3d 322 (2001) (To determine whether there is a factual basis for a plea, "the trial court must establish that all elements of the crime charged are present."). Self asserts that only way to confirm that she pleaded to intentional criminal threat was for the district court to review a transcript of the 2013 plea hearing, and because the State failed to do so, the State failed in its burden of proof.

We disagree. Although the State's evidence is far from overwhelming, it is sufficient to prove Self's criminal history by a preponderance of the evidence. The State's 2013 amended complaint which bears the district court's initials and date sufficiently shows that Self pleaded guilty to intentional rather than reckless criminal threat, even though the amended complaint was not filed until the day after her plea. The State thus showed the district court that Self's conviction in 2013 was more likely than not for intentional criminal threat. No more is required. Self has thus shown no error in the criminal history score of B that the district court used.

29

*Self's Sixth Amendment, judicial factfinding claim fails.*

Self also raises a constitutional argument challenging the district court's authority to determine whether her conviction was for intentional or reckless criminal threat. Self argues that the Sixth Amendment prohibits a sentencing court from factually determining whether a defendant has been convicted of an intentional or reckless criminal threat. She claims that the criminal threat statute is not divisible, and so, the district court could not use the modified categorical approach to determine whether she was convicted of intentional or reckless criminal threat without violating her constitutional rights.

The State correctly notes that this argument is not properly raised here because this is not a direct appeal of Self's 2013 criminal threat conviction. Nor did Self raise this issue in the district court. Constitutional grounds for reversal asserted for the first time on appeal are not properly before the appellate court for review. See *State v. Holley*, 315 Kan. 512, 524, 509 P.3d 542 (2022). And although this court may correct an illegal sentence at any time, constitutional challenges do not generally fit within the definition of an illegal sentence. See *State v. Johnson*, 317 Kan. 458, 464-65, 531 P.3d 1208 (2023).

Additionally, our Supreme Court has held that for alternative means offenses, the district courts may look beyond just the fact of the conviction to determine how it should be treated in calculating a defendant's criminal history score. When the presentence investigation report alone does not establish which version of the offense the defendant committed, the court applies the "'modified categorical approach.'" This allows district courts to review charging documents, plea agreements, transcripts of plea hearings, findings of fact and conclusions of law from any bench trial, as well as jury instructions and completed verdicts. See *State v. Obregon*, 309 Kan. 1267, 1274, 444 P.3d 331 (2019) (discussing modified categorical approach in relation to alternative means out-of-state crimes). Our Supreme Court has found that criminal threat is an alternative means crime. See *Johnson*, 310 Kan. at 839-40. So contrary to Self's argument, the district court had

30

authority to determine whether her conviction was for intentional or reckless criminal threat.

Self thus fails to show error in the district court's determination that the State met its burden to prove that Self's prior conviction arose under a portion of the statute that remained constitutional after *Boettger*. Because Self is not entitled to relief on this claim, we affirm her sentence.

Affirmed.